PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RIAZ BAQIR, M.D.,
             *Plaintiff-Appellant,*

v.

ANTHONY J. PRINCIPI, Secretary,
Department of Veterans Affairs,
             *Defendant-Appellee.*

No. 04-2369

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-02-179)

Argued: September 21, 2005

Decided: January 20, 2006

Before KING and GREGORY, Circuit Judges, and
R. Bryan HARWELL, United States District Judge for the
District of South Carolina, sitting by designation.

---

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Harwell joined. Judge Gregory wrote a separate opinion
concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** John Richard Sutton, Jr., SUTTON LAW FIRM, Candler,
North Carolina, for Appellant. Paul Bradford Taylor, Assistant United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,

Charlotte, North Carolina, for Appellee. **ON BRIEF:** April Burt Sutton, SUTTON LAW FIRM, Candler, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Dr. Riaz Baqir appeals the district court's award of summary judgment in favor of the Secretary of the Department of Veterans Affairs (the "VA") in Baqir's employment discrimination suit. Baqir initiated this action in the Western District of North Carolina, alleging claims under, inter alia, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 (the "ADEA"). Baqir maintains that the VA subjected him to a hostile work environment during his employment at the VA Medical Center in Asheville, North Carolina (the "Asheville VA Center"); discharged him from that employment on the basis of his race, color, religion, national origin, and age; and retaliated against him for seeking administrative relief on his discrimination claims. Following discovery, the court awarded summary judgment to the VA on each of Baqir's Title VII and ADEA claims. As explained below, we affirm.

I.

A.

In his complaint, Baqir alleges that he is black, he is a practicing Muslim, his national origin is Pakistani, and he was born on November 1, 1946.[1] After receiving a medical degree in Bangladesh in 1970, Baqir pursued his career as a physician in the United States, eventu-

---

[1]Because this appeal is from an award of summary judgment to the VA, we are obliged to present and assess the relevant facts in the light most favorable to Baqir, the non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004).

ally as a cardiologist. He worked as a cardiologist at a hospital in New York between 1989 and 1994, and at the VA Medical Center in Wilkes-Barre, Pennsylvania (the "Wilkes-Barre VA Center"), between 1994 and 1998. In April 1998, Baqir left the Wilkes-Barre VA Center for a one-year unaccredited fellowship at the Pennsylvania Hospital in Philadelphia. His fellowship focused on training in the specialized field of interventional cardiology, which involves performing invasive procedures such as catheterizations to treat blockages in coronary arteries with balloons, stents, and cutting devices. During his fellowship, Baqir acted as the primary operator on only basic — and never complex — procedures. Nevertheless, upon the completion of his fellowship, Baqir's supervisors recommended him as an interventional cardiologist, observed that he was ready to perform more complicated procedures, and opined that he was prepared to work independently.

Baqir was thereafter hired to serve as an interventional cardiologist at the Asheville VA Center, a job opportunity created by the resignations of the only two interventional cardiologists on the Asheville VA Center's staff. Baqir was expected to serve as the sole interventional cardiologist at the Asheville facility and to work independently without further specialized training.[2]

On July 7, 1999, Baqir (then age fifty-two) received a written employment offer from the Asheville VA Center. The offer specified that Baqir's appointment was contingent upon his "satisfactory completion of the credentialing process" and "approval by the Medical Center Director," and that the appointment was to run for a temporary period not to exceed thirteen months. J.A. 62.[3] Baqir had been recruited to work for the Asheville VA Center by its Chief of Surgery, Dr. Peter McKeown; however, as reflected in the written offer, the final hiring authority rested with the Medical Center Director, James Christian, a non-physician.

---

[2]Baqir contends that he was not informed of these expectations at the time he was hired, and that he did not represent that he could meet these expectations. He points to no evidence, however, to dispute that these actually were the VA's expectations.

[3]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

On July 15, 1999, the Physician Professional Standards Board and the Medical Staff Executive Council (together, the "Board") of the Asheville VA Center met to review Baqir's credentials and consider his request for privileges in interventional cardiology.[4] It was observed that, although Baqir was recommended as an interventional cardiologist by his supervisors at the Pennsylvania Hospital, one of his colleagues at the Wilkes-Barre VA Center described Baqir's practice abilities as "average" and refused to sign a peer appraisal form because the number of procedures that Baqir claimed to have performed "appeared grossly exaggerated." J.A. 65. Based on these mixed reviews of Baqir's work, the Asheville VA Center's Chief of Medicine, Dr. Lewis Elliston, expressed concern that Baqir was inexperienced and that there was no interventional cardiologist on staff to proctor him. Id.[5] Accordingly, the Board recommended, on July 15, 1999, that Baqir be granted privileges in "general, diagnostic cardiology," but that privileges in interventional cardiology be withheld pending an assessment of Baqir by an interventional cardiologist at another facility. Id. at 65-66. These recommendations, as embodied in the minutes of the Board meeting, were accepted by the Asheville

---

[4]"Credentials" include such items as relevant licenses, information on physical and mental health status, peer assessments of professional competence, continuing education records, and board certifications. "Privileges," which are granted based on credentials and other considerations, allow a physician to practice at a hospital in a particular field of medicine.

[5]As one Asheville VA Center official explained, the Center requires each new employee to undergo "a probationary period" during which his performance is evaluated and he can be terminated without all of the formalities afforded to longer-term employees. J.A. 123-24. For a "physician provider," the probationary period includes a proctorship, or observation by another doctor "to have one more double-check on the competence of that provider." Id. at 124. The proctorship consists of observation and evaluation, and "[i]t is absolutely not an additional training period." Id. Under the "Bylaws and Rules of the Medical Staff" of the Asheville VA Center, a new physician must demonstrate competence during the period of proctoring, which generally lasts ninety days but may be extended to allow the physician to be observed in an adequate number and diversity of cases.

VA Center's then-Acting Chief of Staff, Dr. James Martin, and given final approval by Christian.[6]

## B.

Baqir began working for the Asheville VA Center on July 18, 1999. According to the written offer, his annual salary was set at $92,217, and he was given a "special pay" enhancement of $41,500 based on his skill level. On July 19, 1999, Baqir signed a standard "Special Pay Agreement" that contained provisions providing for the full refund of the special pay if his employment ended either "voluntarily or because of misconduct" prior to July 17, 2000. J.A. 211.

Pursuant to federal travel regulations, Baqir was entitled to payment of his moving expenses, as well as storage of household goods for ninety days (plus an additional ninety days under certain circumstances upon Baqir's written request). Baqir's belongings were picked up by a moving company, delivered to Asheville on July 27, 1999, and, because Baqir was not able to receive the goods, placed into storage by the moving company, all at the VA's expense. Baqir had until approximately October 27, 1999, to retrieve his belongings or request an extension of the paid storage period.

## C.

During its July 15, 1999 meeting, the Board had decided that Baqir's direct supervisor, Elliston, would arrange for Baqir to go to the VA Medical Center in Durham, North Carolina (the "Durham VA

---

[6]Under the procedures in place at the time of Baqir's request for privileges, the Board made its recommendation to the Chief of Staff, who in turn made a further recommendation to the Medical Center Director. Both the Chief of Staff and the Medical Center Director possessed "independent authority and discretion to accept, decline, or modify recommendations of the Board." J.A. 199. The Chief of Staff was a member of the Board, and the Medical Center Director was an ex-officio member of the Board. Accordingly, they attended the meetings at which the Board's recommendations were made. It appears that the decisions of the Board, the Chief of Staff, and, ultimately, the Medical Center Director, were contemporaneously reached during these Board meetings.

Center"), for an assessment of his skills in interventional cardiology. Meanwhile, Baqir was to be proctored in diagnostic cardiology at the Asheville VA Center by Dr. Sundeep Mediratta. At the time he was proctoring Baqir, Mediratta was the only other cardiologist on staff at the Asheville VA Center, and he was not a member of the Board. Mediratta, a Hindu originally from India, is younger than Baqir. Although Mediratta did not practice interventional cardiology, he did perform invasive diagnostic catheterizations, in addition to carrying out noninvasive functions such as reading tests and ordering medications.

Baqir asserts that he was subjected to hostile treatment as early as his first day of work at the Asheville VA Center, when he approached another Hindu colleague, who responded: "'Don't talk to me. Dr. Mediratta is your chief of cardiology. Report to him. And they have decided to . . . make you [a] noninvasive cardiologist.'" J.A. 110. On July 22, 1999, the day that Mediratta and Baqir first met, Mediratta allowed Baqir to take the lead in performing a diagnostic catheterization. Mediratta observed that Baqir "was not handling the catheters with confidence or accurately" and "did not know how to do the catheterization properly." J.A. 152. Mediratta relayed this assessment to Elliston, and they subsequently decided not to allow Baqir to perform any further catheterizations until he returned from his visit to the Durham VA Center. Baqir perceived the episode as further hostile treatment, in that Mediratta had become agitated with him and left the catheterization laboratory before the July 22, 1999 procedure had been completed, and in that Baqir was thereafter excluded from working in the catheterization laboratory (meaning that he was to practice only noninvasive cardiology). According to Baqir, Mediratta subsequently refused to communicate with him, perpetuating an abusive workplace atmosphere.

On July 23, 1999, Elliston wrote to the Chief of Cardiology at the Durham VA Center, Dr. Kenneth Morris, enclosing the Asheville VA Center's files on Baqir. Elliston asked Morris for "an independent assessment by you of Dr. Baqir's interventional cath skills and any pertinent observations." J.A. 67. Elliston also wrote that "[d]uring our initial assessment of this practitioner he appeared to show signs of excessive insecurity in his procedures and techniques." *Id.*

On July 26, 1999, Dr. Arnold Brown became the Chief of Staff at the Asheville VA Center. On July 30, 1999, Brown directed memoranda to Baqir and Mediratta advising them that Mediratta was appointed to proctor Baqir in diagnostic cardiology for an additional period of at least ninety days. Brown also advised, in his memorandum to Baqir, that arrangements were being made to provide him with proctoring in interventional cardiology at the Durham VA Center, in view of the Asheville VA Center's inability to provide such proctoring itself. Thereafter, on August 26, 1999, Brown sent an e-mail message to his contacts at the Durham VA Center, reiterating the request for physicians there "to proctor Dr. Baqir [in interventional cardiology] and provide an appraisal of his skills and abilities." J.A. 71. Brown reminded his contacts at the Durham VA Center that "some concerns were verbally raised about Dr. Baqir by former colleagues." *Id.* Brown requested an assessment of whether Baqir could "independently perform all the duties of an interventional cardiologist at [that] time (i.e., without further training or experience)," and whether Baqir possessed "the expertise . . . to grant the . . . privileges which he [had] requested" in diagnostic cardiology and three specific procedures in interventional cardiology. *Id.*

Subsequently, on September 15, 1999, the Chief of Staff at the Durham VA Center, John Shelburne, wrote a memorandum to Morris (the Chief of Cardiology there) relaying the particular questions to be addressed in Baqir's evaluation and requesting that the assessment be completed as expeditiously as possible. Shelburne also advised Morris that "if you feel Dr. Baqir is technically competent, further evaluation by a cardiologist like yourself, on site at [the Asheville VA Center] is recommended." J.A. 72.

From September 20 to October 3, 1999, Mediratta was on leave from the Asheville VA Center. During that time period, Baqir was the only cardiologist on duty at the Asheville facility.

On October 4, 1999, Baqir went to the Durham VA Center to be evaluated. His visit concluded around October 22, 1999, the same day Morris sent a final report to Brown. Morris explained therein that Baqir had participated in ten cases at the Durham VA Center with three interventional cardiologists — Morris, Dr. Mitchell Krucoff,

and Dr. Brian Annex.[7] According to Morris, the "unanimous view" of these physicians was that Baqir was "not ready to perform all the duties of an interventional cardiologist," and that he did "not currently possess the expertise to be granted privileges" which had been requested by him in three specific interventional cardiology procedures. J.A. 77.[8] Morris concluded that Baqir "likely [could] perform diagnostic catheterization in an adequate fashion." *Id.* Morris warned, however, that because he and the other physicians had "concentrated on [Baqir's] interventional skills while he was with us," their "obser-

---

[7]At the time of Baqir's visit to the Durham VA Center, Morris (in addition to serving as that Center's Chief of Cardiology) was an Associate Professor of Medicine at the Duke University School of Medicine, where he taught in the interventional cardiology fellowship program. He had independently performed hundreds of complex interventional cardiology procedures; had been teaching such procedures for at least twelve years; and had observed approximately fifty colleagues and trainees performing such procedures. At that same time (October 1999), Krucoff was serving part-time at the Durham VA Center as the Chief of Cardiovascular Laboratories, and was a full-time faculty member at Duke's medical school. He had performed approximately 5,000 interventional cardiology procedures, had trained dozens of interventional cardiology fellows, had observed hundreds of other physicians in the field, and had been involved in establishing some twenty-four catheterization laboratories in India, Israel, Egypt, and the United States. The record does not contain any evidence of Annex's qualifications.

[8]In an October 21, 1999 e-mail message to Morris, Krucoff observed that, although Baqir appeared "to be a highly motivated cardiologist with great enthusiasm to learn," it was clear to Krucoff that Baqir did "not have [a] sufficient grasp of the selection, set up or application of basic interventional devices to operate independently as an interventional attending." J.A. 78. Krucoff later testified in a deposition that "I can say I actually really like Dr. Baqir, but this was not even close. He simply was nowhere near ready to operate as an independent interventionalist at the time we saw him here." J.A. 141-42. Morris testified that "Dr. Baqir's apparent familiarity with the tools [of interventional cardiology] was more that at the level of a beginning fellow than a completing fellow." J.A. 168. Morris found himself "a little embarrassed . . . at the situation" in assessing Baqir, in that "we had this fellow in front of us who obviously had some — a substantial amount of information, who had invested an entire year in training, and did not appear ready to do these procedures." *Id.* at 169.

vations in this area [diagnostic catheterization] may not be adequate." *Id.*

Shortly thereafter, on October 29, 1999, Mediratta wrote a letter to Elliston reporting on his early observations of Baqir in diagnostic cardiology at the Asheville VA Center. According to Mediratta, Baqir was "unable to complete a diagnostic procedure . . . without considerable help" and was unable to use the catheter equipment properly. J.A. 79. Mediratta advised that Baqir could not perform diagnostic catheterizations independently and that he needed "to be supervised or receive further training." *Id.*

D.

On November 4, 1999, Baqir requested from Brown at the Asheville VA Center a copy of his credentialing file, including all notes and written communications with the Durham VA Center. Baqir reviewed the file that same day and immediately notified Brown and Elliston of his contention that Morris had overstated the extent of the Durham VA Center physician's observations; that is, Baqir contended that he had actually participated in fewer and less complex procedures than reported by Morris, and that his visit to the Durham VA Center was insufficient to assess his interventional cardiology skills. He also noted that there was now a consulting interventional cardiologist at the Asheville VA Center. Accordingly, Baqir requested that he be permitted to work with the consulting interventional cardiologist "until such time that I can be considered as [having] completed my proctorship successfully." J.A. 82.

On November 5, 1999, the Board met to review the report from the Durham VA Center on Baqir's interventional cardiology skills, his response thereto, and Mediratta's report on Baqir's ability to perform diagnostic procedures. In response to Baqir's contention that he had not been proctored on enough cases and should be proctored longer, "Dr. Brown pointed out that proctoring is used to determine competence and is not a period of training." J.A. 84. It was also acknowledged that "Dr. Baqir was hired as a fully trained interventional cardiologist." *Id.* Based on the negative assessments before them, the Board members present at the meeting voted unanimously to recommend denial of the privileges requested by Baqir in interventional car-

diology, as well as to recommend that such denial be reported to the National Practitioner Data Bank in accordance with their interpretation of VA regulations.[9] Brown advanced the Board's recommendations to Christian, who approved them. Both Brown and Christian were in attendance at the November 5, 1999 meeting.

On November 12, 1999, Baqir's wife, Dr. Marriyam Moten, then-Chief of Cardiology at the Wilkes-Barre VA Center, spoke by telephone with Elliston, a member of the Board who had attended its November 5 meeting. According to Moten, Elliston advised her during this conversation that Baqir was to be terminated because of his age. (Baqir had recently turned fifty-three.) Elliston told Moten "that 'age [was] the major and only factor'" for Baqir's discharge, and that "'interventional cardiology is meant for people in their thirties.'" J.A. 197. Elliston later conceded that he had told Moten that interventional cardiology "was a young man's sport." *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. Ex. 3 at 25. Elliston asserted that he had not meant to convey that Baqir was being fired because of his age, but rather had been attempting to recommend to Baqir, in a kind manner, that he practice in another area of cardiology for which he possessed the requisite capabilities.

On November 15, 1999, Christian informed Baqir by letter that he was being terminated from his employment, effective December 3, 1999, because he had not been granted the privileges necessary to fulfill the requirements of the position of interventional cardiologist for which he had been hired. According to Christian, he possessed the sole authority not only to hire, but also to fire, Baqir. In deciding on Baqir's discharge, Christian took into account the Board's recommendations, the reports of Morris (at the Durham VA Center) and

---

[9]The National Practitioner Data Bank contains information about physicians' licensure, professional society memberships, medical malpractice payment history, and record of clinical privileges. It is intended "to improve the quality of health care by encouraging State licensing boards, hospitals and other health care entities . . . to identify and discipline those who engage in unprofessional behavior; and to restrict the ability of incompetent physicians . . . to move from State to State without disclosure or discovery of previous medical malpractice payment and adverse action history." *See* http://www.npdb-hipdb.com/npdb.html.

Mediratta (at the Asheville VA Center), his own review of Baqir's file, the needs of the Asheville VA Center for a fully trained interventional cardiologist, and the fact that there was no interventional cardiology training program at the Asheville facility.

On November 18, 1999, the Asheville VA Center's Medical Staff Coordinator, Margaret Villalpando, contacted legal counsel to verify that the Center was required to report the denial of Baqir's request for privileges in interventional cardiology to the National Practitioner Data Bank. Villalpando received an affirmative response and thereafter, at Christian's direction, submitted the report about Baqir to the Data Bank.

E.

On December 15, 1999, Baqir filed an administrative complaint in the VA's Office of Resolution Management alleging discrimination. *See generally* 29 C.F.R. pt. 1614 (outlining pertinent complaint procedures for federal employees). Baqir had previously communicated with a VA Equal Employment Opportunity Counselor (the "EEO Counselor") on November 1, November 10, and December 1, 1999. Baqir points to no evidence, however, establishing that any official of the Asheville VA Center had become aware, prior to the filing of his administrative complaint, that Baqir had sought relief through the EEO Counselor.

By the time Baqir's administrative complaint was filed, his household goods that had been stored at the VA's expense had been impounded, because Baqir had neither retrieved his belongings nor requested an extension of the paid storage period. The VA was not informed of the impoundment and did not direct it; rather, the VA simply did not pay the storage bill beyond October 27, 1999, the end of the standard ninety-day period authorized under the applicable federal travel regulations.

On December 22, 1999, following the filing of Baqir's administrative complaint, the Accounting Section of the Business Office at the Asheville VA Center sent a notice to Baqir instructing him to refund the special pay portion of his salary. The Chief of the Accounting Section, Vernon Lane, had decided to send the notice after receiving

a routine notice of Baqir's departure from the Asheville VA Center and interpreting his Special Pay Agreement to require such a reimbursement. The parties dispute whether the Agreement actually mandated repayment in the circumstances of Baqir's discharge. There is no dispute, however, that Lane himself was unaware on December 22, 1999, that Baqir had filed his administrative complaint.[10]

## II.

On July 29, 2002, Baqir initiated this action against the VA in the Western District of North Carolina, alleging four counts under federal law and four counts under state law.[11] On September 11, 2003, the district court dismissed the four state-law counts. On March 31, 2004, the VA filed a motion for summary judgment on the remaining federal-law counts, i.e., the Title VII and ADEA claims. In these counts, Baqir asserted that the VA: (1) terminated his employment based on his race, color, religion, and national origin, in contravention of Title VII; (2) terminated his employment based on his age, in violation of the ADEA; (3) subjected him to a hostile work environment; and (4) retaliated against him for contacting the EEO Counselor on November 1, 1999, while he was still employed at the Asheville VA Center.

---

[10]Baqir asserts that the VA replaced him in November 2000 with a similarly qualified interventional cardiologist who is younger than Baqir and originally from India. For his part, Baqir apparently did not work again until March 2003, when he took a position at the Pennsylvania Hospital as a noninvasive cardiologist while being retrained as an invasive cardiologist under the supervision of Dr. Vidya Banka, the same physician who had overseen Baqir's fellowship in interventional cardiology. According to Banka, by March 2004, Baqir was "performing in assisting roles as an interventional cardiologist," and he was "progressing well" although his "learning curve [was] slow." J.A. 98. Banka stated that, because of rapid advances in interventional cardiology while Baqir was out of that field from December 1999 to March 2003, he needed "more time for retraining." *Id.*

[11]Baqir has indicated that he properly exhausted his administrative remedies before initiating this action, and the VA does not contend otherwise. *See* 29 U.S.C. § 633a; 42 U.S.C. § 2000e-16; 29 C.F.R. pt. 1614.

Under Rule 7.1 of the Western District of North Carolina's Local Rules of Civil Procedure, Baqir was required to respond to the VA's summary judgment motion within fourteen days. Thus, when Baqir had not responded to that motion by April 21, 2004, the court entered judgment in favor of the VA and dismissed the case with prejudice. On April 22, 2004, Baqir filed a motion for relief from judgment, contending that his counsel was unaware of the pertinent local rule and in good faith believed that he had thirty days to respond. By its Memorandum and Order of September 3, 2004 (the "Order"), the court granted Baqir's motion for relief from judgment, but also granted the VA's summary judgment motion on the merits. Baqir has filed a timely notice of appeal, and we possess jurisdiction under 28 U.S.C. § 1291.

### III.

We review de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). Such an award "is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (alteration in original).

### IV.

### A.

We first address Baqir's claim that the VA discharged him on the basis of his race, color, religion, and national origin, in contravention of Title VII. This claim is governed by section 717(a) of Title VII, which provides that "[a]ll personnel actions affecting" certain federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). As for private-sector employees, section 703(a)(1) of Title VII makes it unlawful for their employers "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." *Id.* § 2000e-2(a)(1). Although phrased differently, section 703(a)(1) and

section 717(a) have generally been treated as comparable, with the standards governing private-sector illegal claims applied to such claims brought by federal employees. *See Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc) (recognizing that disparate treatment claims under section 703(a)(1) and section 717(a) are subject to same inquiries).

In asserting that the evidence suffices to require a trial on his Title VII illegal discharge claim, Baqir relies on the familiar *McDonnell Douglas* burden-shifting framework. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (citing, inter alia, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973), for proposition that plaintiff could avert summary judgment on section 703(a)(1) illegal discharge claim by utilizing burden-shifting framework); *Page*, 645 F.2d at 231 (approving district court's application of *McDonnell Douglas* framework to section 717(a) failure-to-promote claims). Under the first step of the *McDonnell Douglas* framework, Baqir must demonstrate a prima facie case of prohibited discrimination. *See Hill*, 354 F.3d at 285. Baqir's prima facie case may be established by showing that (1) he is a member of a protected class, (2) he suffered an adverse employment action (such as discharge), (3) he was performing his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) his position remained open or was filled by a similarly qualified applicant outside the protected class. *See id.*

Without discussing the other elements of the prima facie case, the district court properly concluded that Baqir's Title VII illegal discharge claim failed for lack of evidence on the third element, i.e., that he was performing his job duties at a level that met the VA's legitimate expectations. *See* Order at 13-14. Simply put, Baqir was hired to serve at the Asheville VA Center as an interventional cardiologist who could work independently and without further training, but he was unable to meet the VA's expectations in that regard, as confirmed by the physicians at the Durham VA Center who assessed Baqir's capabilities. That assessment is not one which we are inclined to impugn. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 218 (4th Cir. 2002) (observing that "[h]ospitals have historically had wide discretion to make decisions regarding their medical staff").

Baqir himself does not question the credentials of the Durham VA Center physicians or accuse them of harboring discriminatory motives. Rather, he attempts to discredit the Durham VA Center physicians' assessment of his skills by speculating that it was tainted by negative reports about Baqir from the Asheville VA Center and a reluctance on the part of the Durham VA Center physicians to render a positive evaluation that might have required them to travel to Asheville for further observations. *See* J.A. 67 (letter from Elliston at Asheville VA Center to Morris at Durham VA Center observing that "[d]uring our initial assessment of [Baqir] he appeared to show signs of excessive insecurity in his procedures and techniques"); J.A. 71 (e-mail message from Brown at Asheville VA Center to contacts at Durham VA Center reminding them that "some concerns were verbally raised about Dr. Baqir by former colleagues"); J.A. 72 (internal memorandum from Shelburne at Durham VA Center to Morris advising him that "if you feel Dr. Baqir is technically competent, further evaluation by a cardiologist like yourself, on site at [the Asheville VA Center] is recommended").

There is no evidence, however, that the opinions of the Durham VA Center physicians were actually tainted in any manner. Rather, their conclusions were unanimous and unequivocal: Baqir was "not ready to perform all the duties of an interventional cardiologist" and did "not currently possess the expertise to be granted privileges" which had been requested by him in three specific interventional cardiology procedures. J.A. 77; *see also supra* note 8. Indeed, Baqir has essentially conceded that he could not satisfy the VA's expectations, in that he has asserted that he never represented to the VA that he could immediately function independently as an interventional cardiologist.

Nevertheless, Baqir insists that his evidence is sufficient to create a genuine issue of fact on the third element of the prima facie case. First, he points out that "he had substantial qualifications, experience and training, along with the recommendations of highly qualified interventional cardiologists" who supervised his fellowship at the Pennsylvania Hospital. *See* Appellant's Br. at 16. The crucial inquiry, however, is whether Baqir was meeting the legitimate expectations of the VA. At best, Baqir's evidence indicates that his qualifications, experience, and training should have left him prepared to work inde-

pendently as an interventional cardiologist, and that his supervisors at the Pennsylvania Hospital believed he was ready to do so (although, notably, he had never served as the primary operator on a complex interventional cardiology procedure during his fellowship there).

Next, Baqir asserts that he was denied a minimum ninety-day proctorship and allowed to participate in only a "grossly inadequate" number of procedures. *See* Appellant's Br. at 16. He offers no evidence, however, that a ninety-day proctorship was required under the circumstances of his employment, in which it quickly became apparent to VA officials that Baqir was not competent to serve in the position for which he had been hired. Baqir's contention that his proctorship was prematurely halted seems to rest on the notion that he was entitled to time and training to improve his skills. This notion is contradicted by the undisputed facts: Proctorship was a period of evaluation — not training — for all new physicians at the Asheville VA Center, and, in any event, the Asheville facility was unable to provide training in interventional cardiology.

Finally, Baqir points out "that despite Dr. Mediratta's unfavorable assessment of Dr. Baqir's skills, the [Asheville VA Center] had no problem allowing Dr. Baqir to serve as the only cardiologist on staff while Dr. Mediratta was on vacation for two weeks" in September and October 1999. *See* Appellant's Br. at 16. Baqir seems to suggest that his solo service as a cardiologist belies two propositions: first, that Mediratta's opinion was trustworthy; and second, that officials at the Asheville VA Center actually doubted Baqir's skills. Baqir also emphasizes the longstanding discord between Muslims of Pakistani origin (such as him) and Hindus of Indian origin (such as Mediratta). Unfortunately for Baqir, whether Mediratta's opinion was biased or trustworthy is largely irrelevant to the viability of Baqir's Title VII illegal discharge claim. Mediratta only evaluated Baqir's skills as a diagnostic cardiologist; Baqir had been hired as an interventional cardiologist, and the assessment of his skills in that specialty was left to the physicians at the Durham VA Center. Furthermore, there is no evidence that Baqir was performing any invasive procedures — diagnostic or interventional — during Mediratta's two-week leave. The Asheville VA Center's willingness to permit Baqir to work alone for that period therefore is not indicative of his abilities as an interventional cardiologist or the VA's true perception thereof. Accordingly,

we are constrained to agree with the district court that Baqir's Title VII illegal discharge claim fails for lack of evidence to establish the third element of his prima facie case, that he was performing his job duties at a level that met the VA's legitimate expectations.

B.

We next address Baqir's claim that his discharge was based on his age, in violation of the ADEA. Under section 15(a) of the ADEA, "[a]ll personnel actions affecting [certain federal] employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Similarly, section 4(a)(1) of the ADEA renders it unlawful for private-sector employers "to discharge any individual . . . because of such individual's age." *Id.* § 623(a)(1). As in the Title VII context, we have recognized that, in order to prove an ADEA illegal discharge claim against the federal government, a plaintiff must make the same showing as would be required against a private employer. *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991).

Baqir relies on direct evidence in support of his ADEA illegal discharge claim, compelling application of a mixed-motive framework. *See EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 163 (4th Cir. 2004) (recognizing that ADEA claim may be proved under mixed-motive framework, requiring plaintiff to produce, "at most, evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision" (internal quotation marks omitted)). Specifically, Baqir points to Elliston's statements following the November 5, 1999 Board meeting at which it was decided to deny Baqir's request for privileges in interventional cardiology. According to Moten, Elliston informed her on November 12, 1999, that Baqir (who was then fifty-three years old) was to be terminated because of his age. Accepting Moten's statements as true, as we must at the summary judgment stage, Elliston told her "that 'age [was] the major and only factor'" for Baqir's discharge, and that "'interventional cardiology is meant for people in their thirties.'" J.A. 197. Thereafter, on November 15, 1999, Christian informed Baqir that he was being discharged because he had not been granted the privileges necessary to serve as an interventional cardiologist.

The district court concluded that Elliston's comments to Moten — even assuming that he had been speaking on behalf of himself and the other Board members present at the November 5, 1999 meeting — were insufficient to prove that Baqir had been discharged based on his age. *See* Order at 15. Relying on the principle that "'an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision,'" the court recognized that "neither Dr. Elliston nor the Standards Board may 'be viewed as the one principally responsible for the decision'" to fire Baqir. *Id.* at 15-16 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc)). The court observed that the actual decisionmaker here was Christian, and that there was no evidence that he "was illegally influenced" by the Board or simply "'rubber stamp[ed]'" its recommendation. *Id.*

As did the district court, we infer in Baqir's favor that Elliston's comments are reflective of age-based animus demonstrated during the deliberations at the November 5, 1999 Board meeting — deliberations resulting in the denial of Baqir's request for interventional cardiology privileges and, inevitably, his discharge. Unlike the district court, however, we cannot conclude that these comments were unattributable to Christian, who we accept to have been the actual decisionmaker.[12] Christian was an ex-officio member of the Board present at the November 5 meeting, as indicated in the meeting minutes. *See* J.A. 83. Moreover, viewing the facts in the light most favorable to Baqir, it appears that the three steps for the privileges determination — a recommendation by the Board, a further recommendation by Brown as the Chief of Staff, and final approval by Christian as the Medical Center Director — occurred contemporaneously during that meeting. Elliston's comments are therefore attributable to Christian, as well as Elliston and the other participating Board members.

––––––––––––––

[12]As it is ultimately of no significance to the viability of Baqir's ADEA illegal discharge claim, we assume herein that Christian was the actual decisionmaker, as the VA maintains and the district court recognized. We note, however, that Baqir contends that Elliston and Mediratta were the actual decisionmakers.

Even so, Baqir cannot survive summary judgment on his ADEA illegal discharge claim. Under the mixed-motive framework applicable in ADEA cases, although Baqir can prove that age was a motivating factor in his discharge, the VA "can nonetheless avoid liability by proving that it would have terminated [Baqir] even in the absence of a discriminatory motive." *Warfield-Rohr*, 364 F.3d at 164 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) (plurality opinion); *id.* at 276-77 (O'Connor, J., concurring in the judgment)).[13] Based on the unrefuted evidence that Baqir could not perform his job duties as an interventional cardiologist at a level that met the VA's legitimate expectations, *see supra* Part IV.A, the VA has demonstrated that it would have terminated Baqir absent any age-based animus. Baqir therefore cannot proceed with his ADEA illegal discharge claim.

## C.

We turn to Baqir's claim that he was subjected to a hostile work environment during his employment at the Asheville VA Center. In order to proceed to trial on this claim, Baqir must forecast evidence that: (1) he experienced unwelcome harassment; (2) the harassment was based on his race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Bass v. E. I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).[14]

---

[13]By way of the Civil Rights Act of 1991, Congress eliminated an employer's ability to avoid liability in certain Title VII cases upon proof that it would have taken the same adverse employment action absent a discriminatory motive. *See Warfield-Rohr*, 364 F.3d at 164 n.2 (citing 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94-95 (2003). Because Congress did not similarly amend the ADEA, however, ADEA mixed-motive cases remain subject to the *Price Waterhouse* analysis. *Warfield-Rohr*, 364 F.3d at 164 n.2.

[14]Insofar as he alleges harassment based on his race, color, religion, or national origin, Baqir's hostile work environment claim is presumably cognizable under section 717 of Title VII, 42 U.S.C. § 2000e-16. *Cf. Brown v. Perry*, 184 F.3d 388 (4th Cir. 1999) (reviewing merits of plaintiff's section 717 harassment claim). As for any alleged age-based

Baqir has identified the following acts as unlawful harassment: on July 18, 1999, Baqir's first day of work at the Asheville VA Center, a Hindu colleague refused to talk to Baqir and told him to report only to Mediratta; on July 22, 1999, the day Baqir and Mediratta met, Mediratta became agitated while Baqir was performing a diagnostic catheterization and left the catheterization laboratory; thereafter, Baqir was excluded from working in the laboratory pending his visit to the Durham VA Center (meaning he could practice only noninvasive cardiology), and Mediratta would not communicate with him despite having been assigned as his proctor in diagnostic cardiology; Baqir was required to travel to Durham for the assessment of his interventional cardiology skills; and he was afforded only an inadequate period of evaluation before being denied privileges in interventional cardiology and discharged. According to Baqir, "[d]iscriminatory animus based on a protected trait can be shown by the employer's differential treatment of similarly situated employees outside of [his] protected classes." *See* Appellant's Br. at 25-26. The only evidence of disparate treatment that he points to, however, is evidence that the Asheville VA Center extended the proctorships of other physicians (of unspecified race, color, religion, national origin, and age) so that those physicians could be observed performing a sufficient number of procedures on which to assess their competency.[15]

---

harassment, we have previously assumed, without deciding, that a hostile work environment claim is generally cognizable under the ADEA for plaintiffs age forty or older. *See Burns v. AAF-McQuay, Inc.*, 166 F.3d 292, 294 (4th Cir. 1999); *Causey v. Balog*, 162 F.3d 795, 801 n.2 (4th Cir. 1998).

[15]Notably, in pleading his hostile work environment claim and discussing it herein, Baqir has not explicitly alleged a specific discriminatory animus with respect to any particular actor. In rejecting this claim, the district court observed that Baqir had forecast "no evidence that any of [the] alleged 'harassment' was based upon a protected trait." Order at 17-18. We can at least infer, however, that Baqir means to allege that his age motivated the Board's conduct (in view of Elliston's comments following the November 5, 1999 meeting), and that Baqir's religion and national origin prompted the acts of Mediratta and the other Hindu colleague (based on Baqir's general emphasis herein on the longstanding conflict between Hindus of Indian origin and Muslims of Pakistani origin).

Baqir's allegations cannot sufficiently support his hostile work environment claim. As discussed above, Baqir offers no evidence that a longer proctorship was required or had ever been permitted under the circumstances of his employment, in which it quickly became apparent to VA officials that Baqir was not competent to work independently as an interventional cardiologist. *Cf. Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998) (concluding that plaintiff's "conclusory statements that [the employer] treated him less favorably than younger black and white employees of similar rank . . . , without specific evidentiary support, cannot support an actionable claim for [race- or age-based] harassment"). Indeed, the unrefuted evidence shows that all new Asheville VA Center physicians were required to undergo a proctorship to ensure their competency to practice, and that Baqir had to go to the Durham VA Center for an assessment of his interventional cardiology skills because there was no interventional cardiologist on staff at the Asheville facility to proctor him in that specialty. Thus, the decision of officials at the Asheville VA Center to wait for the report of the Durham physicians before allowing Baqir to perform interventional cardiology procedures (or, after his questionable performance of a diagnostic catheterization with Mediratta, any other invasive procedures), is not suggestive of illegal harassment, but rather of "a healthy concern for the safety of patients." *See* Order at 17. Otherwise, Baqir merely complains of rude treatment by Mediratta and another Hindu colleague — conduct falling short of that required to sustain a hostile work environment claim. *See id.* (recognizing that Baqir's "allegations that one doctor told him not to speak to him, that Dr. Mediratta did not communicate with him, and that Dr. Mediratta became agitated on one occasion are not facts that describe an 'abusive' environment"); *cf. Bass*, 324 F.3d at 765 (concluding that allegations "of a workplace dispute regarding [plaintiff's] reassignment and some perhaps callous behavior by her superiors . . . do not describe . . . severe or pervasive gender, race, or age based activity"). Accordingly, Baqir has not shown sufficient evidence to proceed with his hostile work environment claim.

## D.

Finally, we address Baqir's retaliation claim.[16] Baqir is required to

---

[16]The VA does not dispute that a federal employee, like Baqir, may pursue a retaliation claim under Title VII or the ADEA. We therefore

establish, for his prima facie case of retaliation, that he engaged in a protected activity, that the employer took an adverse action against him, and that a causal relationship existed between his protected activity and the employer's adverse action. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). If the employer can then proffer a nonretaliatory reason for its action, Baqir must show that the employer's proffered reason is pretextual. *See id.*

Baqir contends that the VA retaliated against him in response to his initial contact with the EEO Counselor on November 1, 1999, and his subsequent filing of an administrative complaint on December 15, 1999. On appeal, Baqir identifies three acts of alleged retaliation by the VA: causing his household goods to be impounded for nonpayment of storage fees after October 27, 1999; reporting the denial of his request for privileges in interventional cardiology to the National Practitioner Data Bank upon obtaining the advice of counsel on November 18, 1999; and demanding the return of the special pay portion of his salary by notice of December 22, 1999.

---

assume that Baqir's retaliation claim is cognizable under both Title VII and the ADEA. We observe, however, that neither section 717 of Title VII, 42 U.S.C. § 2000e-16, nor section 15 of the ADEA, 29 U.S.C. § 633a, explicitly provides federal employees with such a cause of action. Nonetheless, several of our sister circuits have allowed retaliation claims under section 717 of Title VII and section 15 of the ADEA. *See, e.g.*, *Forman v. Small*, 271 F.3d 285, 298 (D.C. Cir. 2001) (holding that section 15 of ADEA "by its *own* terms alone prohibits" retaliation as one form of age discrimination); *Porter v. Adams*, 639 F.2d 273, 277-78 (5th Cir. 1981) (interpreting broad language of section 717 of Title VII to outlaw reprisals); *Ayon v. Sampson*, 547 F.2d 446, 449-50 (9th Cir. 1976) (concluding that section 717 incorporates anti-retaliation provision for private-sector employees found in section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a)). Moreover, the regulations establishing the pertinent complaint procedures for federal employees specifically prohibit retaliation. *See* 29 C.F.R. § 1614.101(b) (providing that "[n]o person shall be subject to retaliation for opposing any practice made unlawful by title VII of the Civil Rights Act [or] the Age Discrimination in Employment Act . . . or for participating in any stage of administrative or judicial proceedings under those statutes").

The district court assumed that Baqir had stated a prima facie case of retaliation, but concluded that his claim nonetheless failed for lack of evidence to rebut the VA's proffered nonretaliatory reasons for its conduct. Unlike the district court, we are unwilling to accept that Baqir has demonstrated a prima facie case. Even assuming that the conduct alleged by Baqir can be considered to constitute "adverse actions" sufficient to sustain a retaliation claim, he must be able to show that the relevant officials at the Asheville VA Center were aware of his contact with the EEO Counselor or his filing of an administrative complaint at the time the alleged retaliation occurred. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001) (recognizing that plaintiff's "informal contacts with the EEO and informal complaints [would be] protected activities *if* the accused person or entity knew about them" (emphasis added)).

Baqir has not pointed to any evidence that officials at the Asheville VA Center knew, prior to December 15, 1999, that he had been in contact with the EEO Counselor as of November 1, 1999. Therefore, Baqir cannot establish retaliatory motive with respect to the VA's nonpayment of his storage fees as of October 27, 1999 (notably, prior to even his first contact with the EEO Counselor), or the report to the National Practitioner Data Bank sometime after November 18, 1999. Only the December 22, 1999 notice demanding return of his special pay came after Baqir's administrative complaint was filed on December 15, 1999. That notice, however, was generated at the discretion of Lane (the Chief of the Asheville VA Center's Accounting Section), and there is no suggestion that Lane was aware at that time of Baqir's administrative complaint. We therefore conclude that Baqir's retaliation claim lacks merit.

V.

Pursuant to the foregoing, the summary judgment award of the district court must be affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Although I agree that Baqir's claims of discrimination on the basis of race, color, religion, and national origin; hostile work environment;

and retaliation fail as a matter of law, I cannot conclude that summary judgment is appropriate with respect to Baqir's claim of age discrimination. Baqir has produced direct evidence that the *sole* reason for his termination was his age. Although the VA has produced evidence that Baqir was instead fired because of his performance, the question of what actually motivated the VA's decision is for the factfinder, not this Court, to resolve. I therefore respectfully dissent as to Part IV.B of the majority opinion.

The ADEA makes it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Thus, the reason for the employer's decision is the critical inquiry. Viewing the evidence in the light most favorable to Baqir, "age [was] the *major and only* factor" behind the VA's decision to terminate him, as the majority recognizes.[1] *See* J.A. 197 (emphasis added). The majority also accepts that this statement is attributable to the actual decision-maker. We cannot grant summary judgment to the employer under these circumstances.

The majority believes that the VA may "avoid liability by proving that it would have terminated [Baqir] even in the absence of a discriminatory motive." *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004). Although this is so for the traditional *mixed-motive* case, it is not a viable theory on summary judgment here, where not only is there direct evidence of discriminatory animus, but also that the discriminatory animus was the *sole motive* for his discharge.

The exceptional nature of Baqir's evidence merits emphasis. Through Lewis Elliston's statement, which has every indicia of reliability as it was made against his own interest, Baqir shows not just that age was one motive for his termination, but that it was the *only* motive behind his discharge. It is perhaps because such an admission

---

[1]Baqir's evidence of Lewis Elliston's statement, which Baqir's wife recounted in her affidavit, need not be corroborated. *See EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004). Nevertheless, I note that Elliston conceded that he related Baqir's termination to age in telling Baqir that interventional cardiology was "a young man's sport." *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. Ex. 3 at 25.

is so unusual that the majority's analysis goes astray. Typically, a plaintiff is only able to show that an employer exhibited age-based animus or that age was one of the motivating factors for its decision. In such circumstances, it is entirely appropriate to evaluate whether age made a difference to the outcome of the employer's decision; liability is not appropriate if the legitimate factors that the employer actually considered alone supported its decision.

However, where, as here, a single illegitimate reason was the actual basis for the employer's decision, the fact that an alternative legitimate basis might also have existed is without consequence. In the present case, Baqir's evidence is that the VA did not consider his performance at all at the time it made its decision. Therefore, the VA cannot prevail at the summary judgment stage through evidence that legitimate considerations motivated its decision instead. Rather, the VA's evidence creates an issue of fact regarding what its motives were.[2]

I note that all this is not to say that Baqir has proved his case. The VA may, of course, argue to the factfinder that Baqir's performance was one of, if not the only reason it actually decided to terminate Baqir. As recounted by the majority, the VA has produced evidence that Elliston's explanation for the VA's decision is untrue. However, it is not our function on summary judgment to weigh the evidence and assess credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, we must only determine whether material facts remain in issue. Here, there is a genuine factual question as to what the VA's actual motives were. Clearly, a reasonable juror would be entitled to believe the very words attributable to the decisionmaker,

---

[2]Even under the traditional mixed-motive scenario, "[a]n employer may not . . . prevail . . . by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989) (plurality opinion). Thus, the question is not whether an employer "could have" terminated the employee regardless of his age, but whether the employer "would have" done so. *See Warfield-Rohr*, 364 F.3d at 164. Post-hoc justifications have no effect under a statute concerned only with a defendant's actual motives. Although the VA argues that it considered its legitimate motive contemporaneously with making its decision, the evidence is contradictory on this point.

stating that the *sole* reason Baqir was terminated was because of his age. Accordingly, summary judgment for the VA on Baqir's age discrimination claim was inappropriate.