**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1706**

JANE C. CALDWELL,

Plaintiff - Appellant,

versus

STEPHEN L. JOHNSON, Administrator for the
United States Environmental Protection Agency,

Defendant - Appellee.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  William L. Osteen, Sr.,
District Judge.  (CA-03-707-1)

Argued:  May 22, 2006                Decided:  August 15, 2008

Before WIDENER[1] and MICHAEL, Circuit Judges, and Joseph R. GOODWIN,
Chief United States District Judge for the Southern District of
West Virginia, sitting by designation.

Affirmed in part, and reversed and remanded in part by unpublished
per curiam opinion.

**ARGUED:** John Heydt Philbeck, Sr., ALLEN & PINNIX, Raleigh, North
Carolina, for Appellant.  Joan Brodish Binkley, Assistant United

---

[1]Judge Widener heard oral argument in this case but did not
participate in the decision. The opinion is filed by a quorum of
the panel pursuant to 28 U.S.C. § 46(d).

States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The appellant, Dr. Jane C. Caldwell, appeals the district court's Order granting summary judgment to her employer, the Environmental Protection Agency ("EPA"), on her claims arising under Title VII of the Civil Rights Act of 1964. On appeal, Dr. Caldwell claims that the district judge erred in three respects: (1) by granting summary judgment on her claim for hostile work environment discrimination by coworkers; (2) by granting summary judgment on her claim for hostile work environment discrimination by supervisors; and (3) by granting summary judgment on her claim for retaliation. Because her employer addressed promptly and reasonably each of her allegations of discrimination, we affirm the judgment of the district court on the hostile work environment claims. The record contains sufficient evidence of retaliatory conduct to raise a genuine issue of material fact, however, and we reverse the judgment of the district court on Caldwell's retaliation claim and remand for further proceedings.

Dr. Caldwell earned her Ph.D. in toxicology in 1986 and began working for the EPA in 1991.[2]  J.A. 212.[3]  She initially worked as an environmental scientist in the Office of Air Quality Planning and Standards.  Id.  In March 1999, Dr. Caldwell was detailed to the EPA's Office of Research Development ("ORD") in the National Center for Environmental Assessment Research Triangle Park Division ("NCEA-RTP").  Id.  As a subgroup of that office and division, Dr. Caldwell worked under the direct supervision of Dr. Michael Stevens, the Branch Chief of the Hazardous Pollutant Assessment Group ("HPAG").

In the summer of 1999, Dr. Caldwell alleges that she found printed emails in her chair left by a coworker.  The emails consisted of "'jokes' that contained offensive and sexist remarks."  J.A. 214.  On another employee's computer, Dr. Caldwell noticed "materials of a sexual nature (e.g., explicit cartoons depicting naked women)."  J.A. 214-15.  In April 2000, she found another printed email in her chair left by a coworker that contained material that was sexual in nature.  J.A. 215.  On other

---

[2]We review the facts in the light most favorable to the non-moving party, Dr. Caldwell.  Lee v. York County Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007).

[3]Citations herein to "J.A. __" are citations to the Joint Appendix filed by the parties.

**4**

occasions, a male coworker, Gary Foureman, would occasionally approach Dr. Caldwell and "stand uncomfortably close" to her. Later that year, while wearing "bright yellow very short shorts," Mr. Foureman propped his leg up on a chair next to Dr. Caldwell so "[h]is leg and crotch area were very close to [her] face." J.A. 219.

Dr. Caldwell became a permanent employee in HPAG in August 2000. Not long after this change in status, a female coworker named Judy Strickland informed Dr. Caldwell that another of her male coworkers was telling peer employees that he was having an affair with Dr. Caldwell. J.A. 216-17. On April 3, 2001, Dr. Caldwell attended a branch meeting for the purpose of completing surveys aimed at measuring the employees' work environment related to "trust and lack of discrimination." J.A. 235. At the meeting, Mr. Foureman stated loudly to other employees that "[i]t ha[d] been his experience that only bitchy people" complete surveys measuring the work environment, and that he intended to complete his form so as to prevent the results from being skewed by the "bitchy people." J.A. 235.

Dr. Caldwell's Complaint also highlights the behavior of her supervisors in the period from 1999 to early 2001. She states that her supervisors, particularly Mr. Stevens, were openly hostile toward her and other female employees. J.A. 218-20. Stevens frequently called another female employee a "bitch," and warned

**5**

others not to interact with the so-labeled employee. J.A. 218. When he conducted branch meetings, Stevens allowed male employees to speak freely and engage in discussions without criticism, while Dr. Caldwell and her fellow female employees were frequently "cut off," criticized, and treated in a rude and hostile manner. J.A. 221, 227. During a branch meeting in approximately June 2000, Dr. Caldwell was, in her own words, "very vocal in asking [Foureman]" questions about a problem he wished to discuss, and Foureman became "frustrated and stormed out of the meeting." J.A. 220. That afternoon, Stevens asked to meet Dr. Caldwell. During the meeting Stevens reprimanded Dr. Caldwell, told her that "asking too many questions was bad for [her] career," and told her that she "was too vocal and assertive in branch meetings." J.A. 220-21. After that interaction, Stevens became more hostile toward Dr. Caldwell when she spoke at branch meetings, although other male employees remained vocal and interrupted others. J.A. 221-22. Dr. Caldwell noted other discrepancies between the way her supervisors treated her and the way they treated her male coworkers: Stevens denied her travel reimbursements because it benefitted the D.C. office, while male employees received travel reimbursement for similar projects, J.A. 216, 219; he would schedule appointments with male employees, but would demand Dr. Caldwell's time without scheduling, J.A. 1201; and he would frequently scrutinize the work of female employees but not that of male employees, J.A. 1201.

6

Following her placement as a permanent employee, Dr. Caldwell attended her first performance review with Stevens on February 8, 2001. J.A. 227. Stevens told her that she talked too much in branch meetings and asked too many questions. J.A. 228. He indicated that her performance was satisfactory, but that "no matter what [her] qualifications were," he would not recommend her for a promotion to a higher salary grade. J.A. 232.

After these interactions with her supervisors and coworkers, Dr. Caldwell contacted an Equal Employment Opportunity (EEO) counselor, an internal counselor within the EPA, regarding the "disparate treatment and harassment because of gender bias" that she had experienced.[4] When she contacted the EEO counselor, she "described the pornography being passed around the office" and the other conduct of her coworkers. J.A. 207. She indicated to the EPA's Office of Civil Rights on April 5, 2001, that she scheduled an appointment with an EEO counselor for April 6, 2001. J.A. 236-37. Stevens was reassigned a few weeks later to a position where he had no supervisory power over Dr. Caldwell. J.A. 241. Other supervisors with successively higher supervisory power over Dr. Caldwell were likewise reassigned to different posts in the days,

---

[4]Three other female employees, Marsha Marsh, Sharon Taylor, and Amy Grady, filed EEO complaints around the same time as Dr. Caldwell. They complained of sex discrimination and hostile work environment. See, e.g., J.A. 1204.

weeks and months after she filed her EEO complaint, and Beverly

Comfort took over as HPAG branch manager.  J.A. 299, 273, 275-76.

After initiating contact with the EEO counselor, Dr. Caldwell

claimed that she suffered various forms of retaliation at the hands

of her supervisors, including the following:

- Her supervisors, specifically NCEA-RTP Director Lester Grant, delayed and interfered with her promotion and project opportunities.

- Her supervisors, including Stevens, delayed the approval and processing of her promotion package.

- She experienced a delay in approval for an alterative work schedule.

- Management fired a coworker who was working with Dr. Caldwell in order to make Dr. Caldwell miss a deadline.

- In June 2001, Assistant Director of NCEA-RTP Randy Brady sent Dr. Caldwell and the other EEO complainants a formal "letter of warning" and initiated a disciplinary action for "inappropriate actions taken with a contractor employee" that was issued without required notice, and which the supervisor subsequently withdrew.  J.A. 275.

- Her computer was tampered with and she believed that her emails were monitored.

- When Dr. Caldwell and the other complainants moved to a separate office building because they feared for their personal safety, Dr. Caldwell did not have adequate office furniture, and could not access voice mail, office mail and email.  J.A. 1205-06.

- Someone smashed a taillight on her "unique and recognizable" automobile, "in a way inconsistent with it being hit by another car."  J.A. 343.

Dr. Caldwell also contends that her coworkers continued to

harass her after she filed her EEO claim with the EPA in April

8

2001. One coworker, Jim Raub, called her into his office and discussed a scientific paper that he found on the Internet concerning average penis lengths, and the varying methods of measurement. J.A. 238, 1206. Raub told Dr. Caldwell that the conversation was "'okay' because it was 'medical' in nature." Id. On another day in April 2001, Raub called Dr. Caldwell and another EEO complainant into his office and confessed that "he had a fixation with staring at women's breasts," and asked whether the women noticed him staring at their chests. J.A. 244-45. In early May 2001, Raub forwarded an email to Dr. Caldwell, her fellow complainants, and a few other male employees entitled "Fussy Females Play Away." The email quoted another scientific article that stated "[f]emales interact sneakily with males." J.A. 1208-09. The email offended Dr. Caldwell, who sent it to EPA headquarters in Washington. Raub apologized by email the same day. Id.

In May 2001, Dr. Caldwell found an envelope in her chair that contained a document that purported to be a review of a Chinese Tea called "SO WHY MEE (Camellia assassina)." J.A. 267, 1207-08. The review described the tea in unflattering terms, which Dr. Caldwell believed indicated the author's opinion of her and her fellow EEO complainants: that they were bitter, extremely irritating, overfermented, contained thorns, and should be "iced." J.A. 267,

1207-08.  The envelope also contained a passage from Shakespeare's King Lear: "Oh, that madness lies; let me shun that."  J.A. 267.[5]

The record contains other various allegations of discrimination and retaliation, many of which are detailed in Dr. Caldwell's 220 page affidavit and which the Magistrate Judge thoroughly reviewed.[6]

B.

Dr. Caldwell filed her Complaint in the United States District Court for the Middle District of North Carolina on July 28, 2003, alleging discrimination based on disparate treatment because of gender, discrimination based on a hostile work environment, and unlawful retaliation, all in violation of Title VII.  42 U.S.C. § 2000e to 2000e-17.  J.A. 8-33.  The appellee filed a motion for summary judgment, which was referred to a Magistrate Judge for

---

[5]Dr. Caldwell believes that the reference to King Lear was significant because the play involves three daughters who betray their father.  She believes the quote symbolized the three EEO complainants and their grievances with the EPA.  J.A. 269.

[6]The appellee filed a Motion to Strike portions of Dr. Caldwell's affidavit and portions of other witnesses' affidavits because they were not based on personal knowledge and contained inadmissable hearsay.  See J.A. 1195-97.  The Magistrate Judge granted the defendant's motion after it examined the identified portions of the affidavits.  Id.  Because the parties did not include the Motion to Strike or related memoranda in the Joint Appendix, we are unable to determine which portions of the affidavits the Magistrate Judge excluded.  As a result, our review of the facts necessarily resembles the facts reviewed by the Magistrate Judge.

Proposed Findings and Recommendation. The Magistrate Judge entered his Recommendation and Order on March 10, 2005, in which he recommended that the district judge grant the appellee's motion for summary judgment. J.A. 1194-1250.

In reaching this recommendation, the Magistrate Judge found that Dr. Caldwell had offered evidence sufficient to support a prima facie showing that she had suffered hostile work environment gender discrimination under Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 266 (4th Cir. 2001). J.A. 1231-40. Notwithstanding the prima facie showing, the Magistrate Judge recommended granting summary judgment to the EPA on the hostile work environment claims because the EPA was entitled to the affirmative defense that it had exercised reasonable care to prevent and correct any harassing behavior, and because Dr. Caldwell had unreasonably failed to take advantage of any preventive or corrective opportunities offered by her employer. J.A. 1240-45.

The Magistrate Judge also recommended granting summary judgment on Dr. Caldwell's retaliation claim, finding that she failed to offer evidence that the EPA "took adverse employment action" against her. J.A. 1245. The Magistrate Judge found that she did not offer evidence that the EPA took action that "adversely affected the terms, conditions, or benefits of her employment,"

**11**

J.A. 1246-48 (citing Von Gunten v. Maryland, 243 F.3d 858,866 (4th Cir. 2001)).

Dr. Caldwell timely filed objections to the Recommendation and Order. J.A. 1251-67. The District Judge adopted the Recommendation and Order of the Magistrate Judge and entered its judgment order on April 19, 2005. J.A. 1268-69. Dr. Caldwell filed a Notice of Appeal on June 17, 2005. After full briefing and oral argument, this court remanded the case to the district court to determine the effect, if any, of Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), on Dr. Caldwell's retaliation claim. The matter was once again referred to the Magistrate Judge, who determined that White had no impact on Dr. Caldwell's claim because her claim for retaliation arose under 42 U.S.C. § 2000e-16 (which applies to employees of federal agencies) rather than § 2000e-3 (which applies to employees who work for private employers). On June 18, 2007, the District Judge adopted the Recommendation of the Magistrate Judge that White had no impact on Dr. Caldwell's claim. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

"We review the district court's grant of summary judgment de novo." Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 283 (4th Cir. 2004)(citing Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988)). Summary

judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We construe the evidence in the light most favorable to Dr. Caldwell and draw all reasonable inferences in her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III.

### A.

In order to prevail on a supervisor-created hostile work environment claim, an employee must show "(1) unwelcome conduct, (2) based on [the employee's] gender, (3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and (4) some basis for imputing liability to [the employer]." Matvia, 259 F.3d at 266. If an employer takes a "tangible employment action," the employer is strictly liable. Id. at 266. The Supreme Court has defined "tangible employment action" as, among other things, "discharge, demotion, or undesirable reassignment." Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998).

When the employee does not experience a "tangible employment action," the employer may prevail based on an affirmative defense. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807. Here, the district court determined that Dr. Caldwell had presented issues of material fact as to each element of her prima facie hostile work environment claim, J.A. 1231-37, but held that Dr. Caldwell did not experience any "tangible employment action" as a result of her supervisors' behavior.

Dr. Caldwell argues that she suffered tangible employment action as part of the hostile work environment in two respects. First, she alleges that the delay in promotion was a tangible employment action. Second, she alleges that the substandard working conditions she faced after changing buildings qualified as a tangible employment action. We disagree with both contentions.

The record does not support Dr. Caldwell's contention that the delay in her promotion was a tangible employment action. In her deposition, she offered "conjecture" and stated that "I can't tell you an exact constellation of reasons of why it was delayed." J.A. 1076. Additionally, we agree with the district court that a six

month delay in promotion -- especially when the promotion is reviewed by an independent panel comprised of EPA and independent scientists -- does not constitute a tangible employment action under these circumstances.[7] Likewise, the change in Dr. Caldwell's working conditions when she changed buildings does not rise to the level of "discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 808. "A tangible employment action in most cases inflicts direct economic harm." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998). Dr. Caldwell has not pointed to any action that rises to the level of "tangible employment action" which would trigger strict liability.

Next, Dr. Caldwell argues that the appellee failed to satisfy the affirmative defense outlined in Ellerth and Faragher. She maintains that the EPA could not have exercised reasonable care to prevent and correct promptly any harassing behavior because its anti-harassment policy was defective and dysfunctional. She further argues that the EPA failed to remedy quickly her work environment once it became aware of the condition. Neither contention is persuasive.

---

[7]We are not unmindful of the statement in Burlington Industries, Inc. v. Ellerth, that "failing to promote" can be a tangible employment action. 524 U.S. 742, 761 (1998). Dr. Caldwell suffered, if anything, a delay in promotion. She has not offered sufficient evidence, however, to link the purported delay to discrimination by her supervisors.

"[D]issemination of an effective anti-harassment policy provides compelling proof that an employer has exercised reasonable care to prevent and correct sexual harassment. Evidence showing that the employer implemented the policy in bad faith or was deficient in enforcing the policy will rebut this proof." Matvia, 259 F.3d at 268 (citations and quotations omitted). Although Dr. Caldwell concedes that the EPA distributed an anti-harassment policy, she argues that the policy was defective and dysfunctional. The record supports the contrary. Dr. Caldwell herself effectively took advantage of the policy when she approached the EEO counselors, as this contact led the EPA to separate Stevens from Dr. Caldwell. Furthermore, the policy provided employees with clear directions for how to make complaints without involving their supervisors.

Dr. Caldwell's claims that other supervisors failed to take prompt remedial actions in response to her complaints about Stevens' behavior also fails. While the record contains some evidence that she complained about Stevens' behavior before she filed her EEO complaint, nothing in the record supports her conclusion that her prior complaints related to gender discrimination or a hostile work environment. J.A. 1243. The EPA was not made aware of a hostile work environment, and therefore could not have taken "prompt remedial actions." For those reasons, we agree with the district court that the EPA was entitled to

**16**

summary judgment on Dr. Caldwell's supervisor-related hostile work environment claim.

## B.

Dr. Caldwell's claim against the EPA for the discriminatory conduct of her coworkers also fails. Dr. Caldwell may prevail against the EPA on her claim for hostile work environment arising from the actions of her coworkers only if the EPA "was negligent 'in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it.'" Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006) (citing Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999)). Constructive knowledge may be imputed to a defendant when "a 'reasonable [person], intent on complying with Title VII,' would have known about the harassment." Ocheltree v. Scollon Prods., 335 F.3d 325, 334 (4th Cir. 2003)(citing Spicer v. Virginia, 66 F.3d 705, 710 (4th Cir. 1995)).

Dr. Caldwell argues that the EPA had both actual and constructive notice of coworker harassment. She argues that the district court erred in finding that the EPA did not have notice of the harassment, given that the court also found the harassment to be "pervasive" for the purpose of analyzing Dr. Caldwell's prima facie case. See Swentek v. USAir, Inc., 830 F.2d 552, 558 (4th Cir. 1987)(stating that harassment by coworkers can be "so

**17**

pervasive that employer awareness may be inferred").[8]  We need not address this contention, however, because the district court's conclusion ultimately rested on its finding that the EPA's response was prompt and adequate.  J.A. 1239.  The record supports this finding as it shows that the EPA responded by "holding branch meetings to discuss inappropriate behavior in the workplace and by sending out emails discussing inappropriate behavior."  J.A. 1239.  We therefore agree with the district court that summary judgment was appropriate on Dr. Caldwell's claim for a coworker-related hostile work environment.

C.

We now turn to Dr. Caldwell's third contention -- that the district court erred in granting summary judgment in favor of the EPA on her retaliation claim.  She argues that the standard from White applies to federal employees, and that the district court erred in finding that White had no application to her claim.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68.  She

_____

[8]Although the plaintiff's contention has some superficial appeal, it would be illogical for us to assume that whenever a district court determined that a plaintiff had shown that harassment was severe or pervasive for prima facie purposes, the plaintiff had also ipso facto proved that the defendant had constructive knowledge of harassing behavior.  To do so would render the notice requirement a sheer formality.  Likewise, it would render meaningless the statement in Swentek that harassment must be "so pervasive" that knowledge may be assumed, which indicates that the degree of pervasiveness must exceed the level required by the prima facie standard.  Swentek, 830 F.2d at 558.

further argues that the record contains issues of material fact on her retaliation claim. The EPA contends that the <u>White</u> "materially adverse" standard applies only to private employees. It argues that the Court reached the result in <u>White</u> after carefully comparing the difference in § 2000e-2(a)(1) and § 2000e-3(a), both of which apply to private employees, not federal employees. The EPA further argues that it is entitled to summary judgment on the retaliation claim, even under the <u>White</u> standard, because Dr. Caldwell's allegations do not rise to the level of conduct contemplated in <u>White</u>.

The Title VII provision that protects employees of the federal government from workplace discrimination provides the following: "All personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). We have long held that this language prohibits discrimination in the federal workplace just as § 2000e-2 prohibits discrimination in the private workplace. <u>Wright v. Nat'l Archives and Records Svc.</u>, 609 F.2d 702, 705-06 (4th Cir. 1979). Instead of determining whether a "personnel action[]" has taken place, our federal employee discrimination cases have instead adopted the private employment standard of whether a plaintiff has suffered an "adverse employment action." We have noted that "[a]lthough phrased differently, [42

**19**

U.S.C. § 2000e-2[9] and 42 U.S.C. § 2000e-16(a)] have generally been treated as comparable, with the standards governing private-sector illegal claims applied to such claims brought by federal employees." Baqir v. Principi, 434 F.3d 733, 742 (4th Cir. 2006) (citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)).

In 2006, the Supreme Court decided in White that, in order to prevail on a retaliation claim, a privately-employed plaintiff need not show an "adverse employment action defined as a materially adverse change in the terms and conditions of employment." White, 540 U.S. at 60 (quotations and citations omitted). Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 67-68 (quotations and citations omitted). The Supreme Court reached this conclusion after studying the language of § 2000e-2(a)(1) (the private anti-

---

[9]42 U.S.C. § 2000e-2(a)(1) states:

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

**20**

discrimination provision) and § 2000e-3(a) (the private anti-retaliation provision).

That 42 U.S.C. § 2000e-16(a) prohibits substantive discrimination in an identical fashion (if not in identical terms) as 42 U.S.C. § 2000e-2(a)(1) is not in dispute.  Rather, in this case we are called upon to determine whether the standard for retaliation claims announced in White, 548 U.S. at 67-68, applies to actions brought by federal employees.[10]  Our review of the statutory language and recent Supreme Court case law indicates that the White standard applies to federal employees and private employees alike.

1.

We begin with the observation that we face this question from a peculiar standpoint.  Before White, we read the retaliation component of the federal employee statute in harmony with the private retaliation standard without scrutinizing the differing language of the statutes.  Baqir, 434 F.3d at 747-48.  White held that the language of the private anti-retaliation statute provides

_____

[10]We note, as we have in previous cases, that we have never squarely held that § 2000e-16(a) prohibits retaliation in the federal workplace.  See Baqir, 434 F.3d at 742 n.16.  The EPA concedes that § 2000e-16(d) incorporates a retaliation claim through its adoption of the remedies available for a retaliation claim in § 2000e-5(g), but instead argues for a narrow interpretation of the claim.  We therefore need not reach the question here.

substantially broader protection than this court had previously applied in cases such as Von Gunten, 243 F.3d at 866. In doing so, the Court noted meaningful differences in the anti-discrimination and anti-retaliation statutes that provided recovery for a far broader range of retaliatory conduct unrelated to employment. White, 548 U.S. at 60-63. White instructs that the language of the private anti-retaliation provision does not require "actions that affect employment or alter conditions of the workplace." White, 548 U.S. at 62. The question we now face is whether the reference to "personnel actions" in the federal employee provision does impose such a requirement. In other words, we must determine whether an extinct standard that originated from a different statute remains alive and well in the federal employee context.

As an initial matter, we note that in § 2000e-16(a), Congress chose to regulate "[a]ll personnel actions." Section 2000e-16(a) thus on its face covers a broader range of activity than does the private anti-discrimination statute, which must involve activity related to "compensation, terms, conditions, or privileges of employment[.]" 42 U.S.C. § 2000e-2(a)(1). The private anti-retaliation provision, however, contains no such limitation.[11]

_____

[11]That provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

<u>White</u>, 548 U.S. at 62-63. The requirement in the federal employee statute that the activity involve a "personnel action[]" therefore adds an element that the private anti-retaliation provision does not contain.

Unfortunately, Congress did not define the term "personnel actions" in Title VII.  In previous cases involving § 2000e-16(a), we looked to whether the action involved "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating."  <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981).  As we cautioned in <u>Page</u> and elsewhere, "[t]his is the <u>general</u> level of decision we think contemplated by the term 'personnel actions.'" <u>Id.</u> at 233.  We also stated that "<u>Page</u> did not hold . . . that 'hiring, granting leave, discharging, promoting, and compensating' was an exhaustive list of what constituted an 'ultimate employment decision.'"  <u>Von Gunten</u>, 243 F.3d 866 n.3.  Thus, all "personnel actions" need not fall within the examples from <u>Page</u>.[12]

This definition comports with the ordinary meaning of the phrase "personnel action[]."   While, hiring and firing may

---

[12]Indeed, courts have applied <u>Von Gunten</u>'s test of whether an employment action "adversely affected the terms, conditions or benefits" of employment to federal employees whose claims arise under § 2000e-16(a), just as the district court did in this case. <u>See</u> J.A. 1246-48.   In <u>Von Gunten</u>, we described the "terms, conditions and benefits" test as less restrictive that the "ultimate employment decision" test in <u>Page</u>.  <u>Von Gunten</u>, 243 F.3d at 864-66.

represent the prototypical personnel action, many decisions involving human resources constitute personnel actions despite falling short of being "ultimate employment decisions."  The EPA contends that when Congress used the term "personnel actions," it had in mind only those actions that had a direct monetary impact on an employee.  The statutory language, however, contradicts that contention.  If Congress had intended to cover only "personnel actions" that had a direct monetary impact on an employee, it would have used terms identical to those used for private employees in § 2000e-2.  It likewise would not have used the modifier "[a]ll" in front of "personnel actions" unless it intended the statute to sweep broader than personnel actions that have a direct monetary impact on the employee.

Congress has defined the term broadly elsewhere in the federal employment context.  For example, in the Merit Systems Principles in Title 5 governing federal employees, it defined "personnel action" as "(i) an appointment; (ii) a promotion; (iii) an action under chapter 75 of this title or other disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (v) a reinstatement; (vi) a restoration; (vii) a reemployment; (viii) a performance evaluation under chapter 43 of this title; (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance

**24**

evaluation, or other action described in this subparagraph; (x) a decision to order psychiatric testing or examination; and (xi) any other significant change in duties, responsibilities, or working conditions[.]" 5 U.S.C. § 2302(a)(2).  This definition covers not only "ultimate employment decisions," but also "any other significant change in duties, responsibilities, or working conditions."  5 U.S.C. § 2302(a)(2).

The EPA additionally contends that Congress must have intended to include an employment-related action in a retaliation claim because otherwise Congress would have adopted the identical language from the private employment context.  Because Congress chose to do so in different terms, the EPA infers that Congress must have intended two different standards.  As the Supreme Court recently reiterated, "'negative implications raised by disparate provisions are strongest' in those instances in which the relevant statutory provisions were 'considered simultaneously when the language raising the implication was inserted.'"  Gomez-Perez v. Potter, 128 S.Ct. 1931, 1940 (2008) (quoting Lindh v. Murphy, 521 U.S. 320, 330 (1997)).  Here, as in Gomez-Perez, "the two relevant provisions were not considered or enacted together." Id.  Congress enacted § 2000e-3 in 1964, 78 Stat. 257, while it enacted § 2000e-16(a) in 1972, 86 Stat. 111.

The parties cite to different portions of the legislative history to conjure an intent of Congress that supports their

**25**

respective views. Dr. Caldwell directs the court to the statement in the statute's legislative history that: "[T]here can exist no justification for anything but a vigorous effort to accord Federal employees the <u>same</u> rights and impartial treatment which the law seeks to afford employees in the private sector." House Rep. No. 92-238, 1972 U.S.C.C.A.N. 2137, 2158 (1971) (emphasis added). The EPA, on the other hand, points to a statement in the same House Report that indicates that the statute "would extend <u>some</u> protection to Federal employees." <u>Id.</u> at 2137. Plucking these two sentences from the legislative history adds little to the interpretation of the statute. A review of case law from the Supreme Court and from other circuits sheds some light on which standard we should apply.

2.

Our cases have supported the proposition that the anti-retaliation standard that applies to private employees also applies to federal employees. This Court and others adopted (implicitly, if not explicitly) for federal employees the "adverse employment action" standard that was applicable to private employees prior to <u>White</u>. <u>See</u> <u>Baqir</u>, 434 F.3d at 747-48 (applying private standard); <u>see also</u> <u>Price v. Thompson</u>, 380 F.3d 209, 212-13 (4th Cir. 2004) (same). On some occasions, this Court reviewed the private employee anti-retaliation statute (§ 2000e-3(a)) in evaluating the

retaliation claims of a federal employee.  <u>Price</u>, 380 F.3d at 212-13 (reviewing federal employee's invocation of § 2000e-3(a)).

On the one hand, applying the same standard to federal employees and private employees without regard to the statutory language of each provision runs afoul of the Supreme Court's acknowledgment in <u>White</u> that language that differs in important respects may result in differing standards.  On the other hand, it would be illogical for Congress to impose an additional element of proof on federal employees when it has provided identical remedies for federal and private employees who allege retaliation.  This is especially so when, in the words of <u>White</u>,

> The anti-retaliation provision seeks to secure that primary objective [of anti-discrimination] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the [anti-discrimination provision]'s basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct. * * * A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms."

<u>White</u>, 548 U.S. 53, 63-64 (quoting <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997)).

Our sister circuits that have addressed the question in reported opinions after <u>White</u> have all applied the <u>White</u> standard.[13] <u>See</u> <u>Lapka v. Chertoff</u>, 517 F.3d 974, 985-86 (7th Cir. 2008)(applying <u>White</u> standard to Department of Homeland Security employee); <u>Patterson v. Johnson</u>, 505 F.3d 1296, 1299 (D.C. Cir. 2007) (applying <u>White</u> to EPA employee, the same defendant as this case); <u>Nair v. Nicholson</u>, 464 F.3d 766, 768-69 (7th Cir. 2006) (stating that "it is now settled that retaliation to be actionable need not take the form of an adverse employment action" in case involving federal employee). This comes as no surprise because in <u>White</u> the Supreme Court explicitly adopted the test applied by the Seventh and District of Columbia Circuits which applied the "materially adverse" standard in the private employment sphere. <u>White</u>, 548 U.S. 67-68 ("We agree with the formulation set forth by the Seventh and the District of Columbia Circuits.").

It is worthy of mention that, in adopting the D.C. Circuit's test, the Supreme Court cited a D.C. Circuit case that applied the "materially adverse" standard to a <u>federal</u> employee. <u>See</u> <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (applying "materially adverse" standard to an employee of the FBI). That is,

_____

[13]Our review of cases from this circuit and others has revealed scores of unreported cases that apply the <u>White</u> standard to federal employees whose claims arise under § 2000e-16(a). <u>See</u>, <u>e.g.</u>, <u>Moore v. Leavitt</u>, 258 Fed. Appx. 585, 586, 2007 WL 4426625 * 1 (4th Cir. 2007); <u>Parsons v. Wynne</u>, 221 Fed. Appx. 197, 198, 2007 WL 731398, 1 (4th Cir. 2007); <u>Brockman v. Snow</u>, 217 Fed.Appx. 201, 206, 2007 WL 493926 * 3 (4th Cir. 2007).

the Supreme Court chose a <u>federal</u> employment case, rather than a private employment case, from which to adopt the "materially adverse" standard. Moreover, the D.C. Circuit in <u>Rochon</u> specifically rejected the argument that the EPA makes in this case:

> [W]e must consider whether, when referenced in § 2000e-16(d) via § 2000e-5(g)(1)-(2)(A), the general ban on retaliation in § 2000e-3(a) is limited by the requirement in § 2000e-16(a) that "[a]ll [Government] personnel actions" be made free from discrimination. We do not believe the prohibition is so qualified. Nothing in § 2000e-16(d) or § 2000e-5(g) suggests § 2000e-3(a) is to be read differently when applied to the Government. . . . [W]e now hold that an alleged act of retaliation by the Government need not be related to the plaintiff's employment in order to state a claim of discrimination under Title VII.

<u>Rochon</u>, 438 F.3d at 1219 (citations and quotations omitted).

Based on the language of the statute, the Supreme Court's rationale in <u>White</u>, and a review of other courts who have addressed the matter, we conclude that the <u>White</u> standard applies to both private employees and federal employees whose retaliation claims arise under § 2000e-16(a). <u>See</u> <u>White</u>, 548 U.S. at 67-68. Thus, to establish a prima facie case of retaliation, a plaintiff must show (1) that she engaged in protected activity, (2) that her employer took materially adverse action against her, such that it could dissuade a reasonable worker from making or supporting a charge of discrimination, <u>see</u> <u>White</u>, 548 U.S. 67-68, and (3) that a causal relationship existed between the protected activity and the materially adverse activity. <u>See also</u> <u>Price</u>, 380 F.3d at 212.

**29**

3.

The district court initially applied the "adverse employment action" test from Price, 380 F.3d at 212, to Dr. Caldwell's retaliation claim, and determined that summary judgment was appropriate because Dr. Caldwell had not proved a "genuine issue of material fact that [the EPA's] actions adversely affected the terms, conditions, or benefits of her employment." J.A. 1246. On remand, the district court further held that White did not apply to Dr. Caldwell's claims, and did not address either the final element in Dr. Caldwell's prima facie retaliation claim, or the EPA's argument that it can offer a legitimate, non-retaliatory explanation for the action. Because we now find that the White "materially adverse" standard applies to Dr. Caldwell's retaliation claim, we reverse and remand for consideration of the record in light of the new standard.

IV.

We affirm the district court's grant of summary judgment in favor of the EPA on Dr. Caldwell's hostile work environment claims. We reverse and remand the district court's judgment as to Dr. Caldwell's retaliation claim.

Accordingly, the judgment of the district court is

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.