**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1766

MARIE LAURENT-WORKMAN,

Plaintiff - Appellant,

v.

CHRISTINE WORMUTH, Secretary, United States Department of the Army,
JOHN E. WHITLEY,

Defendant - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Anthony John Trenga, Senior District Judge.  (1:20-cv-01272-AJT-MSN)

Argued:  September 13, 2022                    Decided:  November 29, 2022

Before GREGORY, Chief Judge, KING, and HARRIS, Circuit Judges.

Affirmed in part, vacated in part by published opinion.  Chief Judge Gregory wrote the
opinion, in which Judge King and Judge Harris joined.

**ARGUED:**  Paula M. Potoczak, LAW OFFICE OF PAULA M. POTOCZAK, Alexandria,
Virginia, for Appellant.  Peter B. Baumhart, OFFICE OF THE UNITED STATES
ATTORNEY, Alexandria, Virginia, for Appellees.  **ON BRIEF:**  Ruth Ann Azeredo, LAW
OFFICE OF RUTH ANN AZEREDO, LLC, Annapolis, Maryland; Timothy W. Romberger,
LAW OFFICES OF TIMOTHY W. ROMBERGER, Washington, D.C., for Appellant.
Jessica D. Aber, United States Attorney, Richmond, Virginia, Catherine M. Yang, OFFICE
OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

GREGORY, Chief Judge:

Appellant Marie Laurent-Workman appeals the district court's dismissal of her amended complaint filed against her former employer, the United States Department of the Army. Laurent-Workman alleged that she experienced a hostile work environment due to race-based harassment from a co-worker and retaliation by her supervisors through both discrete acts and a retaliatory hostile work environment. For the reasons to follow, we affirm the district court's dismissal of Laurent-Workman's discrete-act retaliation claim, but we vacate its dismissal of her race-based hostile work environment and retaliatory hostile work environment claims.

I.

The district court dismissed Laurent-Workman's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Therefore, we review the district court's dismissal of Laurent-Workman's claims from her perspective, accepting as true the factual allegations in the amended complaint. *Tobey v. Jones*, 706 F.3d 379, 383 (4th Cir. 2013).

A.

Laurent-Workman is an African American woman of Haitian descent who, until August 2020, was a career civilian employee with the Army. Laurent-Workman began working as a Specialist for the Army Substance Abuse Program ("ASAP Specialist") in November 2017 and was stationed at United States Army Garrison Benelux ("USAG Benelux") in Belgium. Shortly after beginning her service at USAG Benelux, Laurent-Workman allegedly experienced racially hostile conduct from a co-worker,

2

Dorothea Adams. Adams is a Caucasian woman of Dutch citizenship who, despite working in a different duty location, had overlapping responsibilities with Laurent-Workman. From "an early point working together," Adams made comments to Laurent-Workman that "blacks cannot speak properly" and that she "cannot understand them." J.A. 13. These comments were not isolated instances. "On several occasions," Adams "referred to African-American/Black soldiers as 'these people,' and further stated she could not understand African-Americans/Blacks." J.A. 16.

While Adams's insulting behavior was ongoing, she received favorable treatment from the supervisor to whom she and Laurent-Workman directly reported, Jasser Khalifeh, a Caucasian man of Jordanian descent. Sometime in June 2018, Laurent-Workman informed Khalifeh of Adams's behavior and her perception that he treated Adams more favorably. Khalifeh refused to take any remedial steps and told Laurent-Workman that she "failed to understand" that Adams is Dutch. J.A. 15.

The hostilities did not subside. During a July 23, 2018 incident, Adams "erupted in anger and said this is NATO, we do things differently than 'you people,'" and followed Laurent-Workman as she walked back to her office, continuing her aspersions. J.A. 16. Laurent-Workman reported this incident to Shun Thomas, an African American man who was her second-line supervisor and the acting director of Human Resources at the time. Thomas also failed to take remedial action. Sometime afterward this incident, Khalifeh removed a quarter of Laurent-Workman's work duties and delegated them to Adams.

Laurent-Workman's subsequent attempts to seek remediation proved unsuccessful. At the end of August 2018, Laurent-Workman met with Thomas to discuss the removal of

3

her job responsibilities, her prior complaints about disparate and harassing treatment, and the failure of management to address the problem. In response, Thomas "retorted" something to the effect of "Do you like your job?" in a manner Laurent-Workman viewed as an attempt to dissuade her from further complaints. J.A. 19. On September 5, 2018, Laurent-Workman witnessed Adams spread a false rumor that another Black woman colleague was under the influence of alcohol in the workplace and reported Adams's comments to Khalifeh. Rather than investigate the situation, Khalifeh ordered Laurent-Workman not to contact Adams, insinuating that Laurent-Workman was "the problem." J.A. 18. Also in September 2018, Khalifeh communicated to a group of colleagues during a work event that black male athletes "excel" in sports because "the slave masters had bred the strongest slaves together." J.A. 19.

Then, on September 24, 2018, Khalifeh reprimanded Laurent-Workman for trying to "step on [Adams's] toes" after she completed a work assignment that was within her job description. J.A. 20. In October 2018, after Laurent-Workman complained to Thomas about Khalifeh's behavior a second time, Khalifeh made her go out of her way to contact the Army's Installation Management Command to acquire a work document important to her work responsibilities, even though he already possessed a copy. After Laurent-Workman requested a meeting to clarify her and Adams's duties, Thomas and Khalifeh held a November 16, 2018 meeting with Laurent-Workman and Adams. During that meeting, Adams again mocked Laurent-Workman, referring to her as "you people" before she "abruptly stood-up in a violent fashion causing her chair to crash into the wall,

4

screamed at Ms. Laurent-Workman and stormed out of the room." J.A. 22. Thomas and Khalifeh took "no meaningful action" against Adams in response. *Id.*

Laurent-Workman suffered more of the same following these incidents. On November 28, 2018, Khalifeh denied her request to attend a suicide intervention skills training that would have allowed her to fulfill an Army-required training. Khalifeh offered her a fabricated reason for the denial. He told her that the budget was not yet approved for expenditures, which was inconsistent with his earlier "mandate" that there was an "urgent" need to spend the budget. J.A. 24. On December 13, 2018, Adams sent Laurent-Workman an "accusatory" email, copying Khalifeh, claiming that Laurent-Workman failed to fully complete work on an assigned education module for soldiers. *Id.* The same day, Laurent-Workman met with counsel to initiate a complaint of discrimination, activity of which Khalifeh and Adams were given notice.

In the months following Laurent-Workman's initial Title VII complaint, Khalifeh engaged in more oppressive conduct. Laurent-Workman could not present data during a monthly ASAP meeting that took place in December 2018 because Adams, the person tasked with data collection, had not compiled the necessary data—a failure recorded in the meeting minutes. However, on February 4, 2019, Khalifeh altered the meeting minutes "to remove and sanitize any mention of Ms. Adams' name and malfeasance in the minutes," leaving Laurent-Workman's name "to make it appear as if it were her fault." J.A. 26. On March 13, 2019, Khalifeh saddled Laurent-Workman with new, unexpected, and unexplained responsibilities. When Laurent-Workman indicated that she could not to take on extra work not in her job description, Khalifeh "mockingly responded 'I thought you cared about taking

care of soldiers.'" J.A. 28. On August 8, 2019, Khalifeh prevented her from presenting at an important work meeting, which she viewed as an attempt to embarrass her in front of her superiors. In September 2019, she was further marginalized when Khalifeh skipped over her in a meeting where she usually had an opportunity to speak. In another instance that month, Laurent-Workman temporarily served as acting ASAP manager while Khalifeh was away, but he assigned another co-worker who was stationed several hours from USAG Benelux to take his place at a meeting the ASAP manager typically attended. On September 10, 2019, Laurent-Workman submitted a second Title VII complaint, of which Khalifeh and Adams had notice.

Due to the stress of her work environment, which often left her in tears and aggravated a preexisting migraine condition, Laurent-Workman began looking for other employment opportunities. In November 2019, a vacancy for a program coordinator position became available within the Human Resources department. A selecting official for that position was Yvette Castro, a Caucasian, Hispanic woman who replaced Thomas as the director of Human Resources in July 2019. While Laurent-Workman and Castro had only a "working relationship" before Castro became director of Human Resources, Castro was "fond" of Khalifeh. J.A. 34. When Castro became director, Khalifeh reported directly to her. Leadership in Human Resources and the ASAP program "regularly shared information on employee matters, including any complaints." *Id.* And "[g]iven Ms. Castro's close working relationship with Mr. Khalifeh and in her position as Director of Human Resources, she would have known about Ms. Laurent-Workman's initial and ongoing EEO activities and the details of the complaints." J.A. 35.

6

After Laurent-Workman applied for the vacant program coordinator position, Khalifeh inadvertently copied her on an email he sent to Castro mocking her interest and qualifications for the position and telling Castro that he would not rehire her. This email reflected what Laurent-Workman believes were ongoing conversations about her between Khalifeh and Castro. During her interview for the position, Castro asked her specifically about conflicts she had with co-workers. Castro then scored her interview performance significantly lower than the other interviewers present. Ultimately, Laurent-Workman was not selected for the position.

Even after these events, Khalifeh continued to give Laurent-Workman trouble. He misinformed her about the date of a February 2020 meeting for which she was tasked with preparing a presentation, which required her to complete the task at the last minute and made her appear incompetent during the meeting. Castro joined the harassment by transferring Laurent-Workman to another office and forcing her to move boxes after she had sustained physical injuries in a car accident. Laurent-Workman's problems eventually ended when she resigned from her position in August 2020.

## B.

On October 28, 2020, Laurent-Workman sued the Secretary of the Army for substantive discrimination and retaliation under Title VII. In her amended complaint, she alleged race/color discrimination, national origin discrimination, gender discrimination, discrete-act retaliation, protected-status hostile work environment, and a hostile work environment premised on retaliation. The Army moved for Rule 12(b)(6) dismissal.

7

In its order dismissing all six counts, the district court construed Laurent-Workman's non-selection for the vacant program coordinator position as the sole basis for her disparate treatment and discrete-act retaliation claims. It concluded that Laurent-Workman could not state a plausible claim for race/color, national origin, and gender discrimination because none of the facts supported an inference of discrimination. Turning to her retaliation claim, the district court concluded that, assuming Castro knew of Laurent-Workman's protected activity, the "more than two and as much as over three months between her last protected activity on December 2, 2019 and her non-selection" did not give rise to a reasonable inference of a causal relationship between the two. J.A. 92.

The district court next analyzed Laurent-Workman's retaliatory and race-based hostile work environment claims together. It determined that the allegations in the Amended Complaint did not plausibly plead conduct that was objectively so severe or pervasive that it altered the terms, conditions, or privileges of Laurent-Workman's employment. Given its analysis, the district court granted the Army's motion to dismiss.

Laurent-Workman appealed the district court's dismissal of her substantive discrimination claim based on a hostile work environment and her retaliation claims sounding in discrete acts and a retaliatory hostile work environment.

II.

We review de novo a district court's grant of dismissal under Federal Rule of Civil Procedure 12(b)(6). *See Wilcox v. Lyons*, 970 F.3d 452, 456 (4th Cir. 2020). So long as a complaint contains factual allegations that "raise a right to relief above the speculative

8

level, thereby nudging [the] claims across the line from conceivable to plausible," dismissal is improper. *Hately v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019) (quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011)). Bearing this standard in mind, we address each of Laurent-Workman's claims on appeal.

## III.

Laurent-Workman first asks us to decide whether the district court properly dismissed her discrimination claim. Title VII forbids employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). That prohibition extends to federal employees like Laurent-Workman through Title VII's federal-sector provision: "All personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." § 2000e–16(a). Laurent-Workman argues that the district court did not consider her allegations in their totality when it determined that she did not plead a plausible race-based hostile work environment claim. We agree.

## A.

The substantive discrimination provision of Title VII makes unlawful an employer's decision to "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." § 2000e–2(a). An employer violates the substantive discrimination provision when it subjects an employee to a hostile work environment. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (en banc). Working conditions

9

form a hostile work environment when they are "permeated with discriminatory intimidation, ridicule, and insult" that "alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

At this stage, "an employment discrimination plaintiff need not plead a prima facie case of discrimination." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (internal citation omitted). To survive dismissal of her claim of a hostile work environment based on her protected characteristics, Laurent-Workman must offer facts that plausibly support inferences that "she was subjected to (1) unwelcome conduct, (2) based on her race [or national origin] or sex, that was (3) severe or pervasive enough to make her work environment hostile or abusive and (4) imputable to [] her employer." *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020) (internal citation omitted). She must also allege that her protected characteristic under Title VII was the "but for" cause of the alleged harassment.

We consider several factors to evaluate whether the alleged working conditions are severe or pervasive enough to support a Title VII claim. These factors include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). However, "[a]ctivities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct." *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

10

B.

The district court concluded that Laurent-Workman's complaint set forth insufficient factual allegations to support a hostile work environment claim. It found Laurent-Workman's allegations too "sporadic" and explained that "the types of personnel actions, reviews, workplace conflicts and work assignments" she alleged were neither severe enough nor related enough to her protected characteristics. J.A. 94–97. The Army urges us to affirm that conclusion because her allegations did not include racial slurs or physical threats, mostly describe conduct by Adams who occupied a different duty location, and did not occur daily.

Even though they do not depict daily misconduct, Laurent-Workman's allegations demonstrate a series of hateful workplace encounters that consistently targeted her racial identity. She alleges that "[a]t an early point working together, Ms. Adams made a racially insensitive comment to Ms. Laurent-Workman and others that 'blacks cannot speak properly.'" J.A. 13. At one point, Adams "erupted in anger and said this is NATO, we do things differently than 'you people,'" and hurled accusations at Laurent-Workman as she attempted to retreat to her office. J.A. 16. According to Laurent-Workman, on several prior occasions "Adams had referred to African-American/Black soldiers as 'these people,' and further stated she could not understand African-Americans/Blacks." *Id.* And during a meeting held ostensibly to clarify Laurent-Workman and Adams's duties, Laurent-Workman claims that Adams again mocked her, referred to her as "you people," and "abruptly stood-up in a violent fashion causing her chair to crash into the wall, screamed at Ms. Laurent-Workman and stormed out of the room." J.A. 22. She also alleges that her direct supervisor Khalifeh

11

announced his belief that Black male athletes "excel" in sports "because the slave masters had bred the strongest slaves together." J.A. 19. The repeat behavior of her coworker and supervisor was neither isolated nor a symptom of trite differences. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims . . . [by their] very nature involve[] repeated conduct.").

We disagree with the district court's contrary reasoning and the Army's endorsement of that position on appeal. Of course, "continuous daily" exposure to racial slurs is both severe and pervasive. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). But daily hostility is not the essence of a Title VII harassment claim. Our focus remains on the discriminatory character, severity, and consistency of the harassment. *See, e.g.*, *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019) (finding that statements the plaintiff learned about second-hand, while racially offensive, ultimately were too remote in time relative to each other to be pervasive); *see also Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008) (recognizing that hostility must be tied to a plaintiff's race or gender).

Laurent-Workman's allegations describe just the sort of workplace behaviors that Title VII serves to root out—repeated invectives of an overtly racial tenor. Adams's statements to Laurent-Workman that Adams could not understand African Americans because they cannot speak properly communicated racial enmity by summoning an odious trope about African American speech patterns. Even more demeaning, Khalifeh's comment connecting the abuses of chattel slavery to athletes of African descent callously evoked the very "history of racial violence, brutality, and subordination" on which the most execrable epithets prey. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir.

12

2004).   Laurent-Workman endured a breadth of publicly humiliating comments from Adams on several occasions, some of which accompanied an element of physical intimidation.   Khalifeh not only knew of Adams's racial hostility, but further entrenched it with his own vile remark.   In view of those circumstances, we are satisfied that Laurent-Workman has pled a plausible claim for a race-based hostile work environment over and "above the speculative level."  *Hately*, 917 F.3d at 782.

## IV.

Next, Laurent-Workman claims that her Army supervisors retaliated against her after she voiced complaints of discrimination.  The anti-retaliation provision found in Title VII makes it unlawful for an employer to "discriminate" against employees or applicants because they have opposed discrimination or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act.  42 U.S.C. § 2000e–3(a).   Its purpose is to protect employees who complain about real or perceived discrimination in the workplace from retaliation, which threatens to chill the willingness of employees to speak up.  *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002) ("The purpose of § 2000e–3(a) is to let employees feel free to express condemnation of discrimination that violates Title VII.").   As with the substantive discrimination provision, the anti-retaliation provision's protections are incorporated by the federal-sector provision.  *See* §§ 2000e–16(d), 2000e–5(g)(2)(A).

Three elements comprise a case for retaliation.  A plaintiff must show (1) that she engaged in a protected activity, (2) that her employer took an adverse action against her,

13

and (3) that there was a causal link between the two events. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016). Laurent-Workman objects to the district court's determinations on elements two and three.[1]

A.

It is necessary at the outset to clarify the proper showing of adversity applicable to retaliation claims. Laurent-Workman argues that the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Company* controls and that the appropriate standard to assess all retaliation claims under Title VII requires us to determine whether an action is "materially adverse" such that it would "dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 64 (2006). The Army counters that *Burlington Northern* has no application here because it reaches only private-sector claims of discrete-act retaliation.

Historically, courts treated retaliation claims similarly to substantive discrimination claims. Although the substantive discrimination provision expressly forbids conduct that affects an employee's "compensation, terms, conditions, or privileges of employment" and the anti-retaliation provision more broadly proscribes discrimination against employees who

---

[1] Laurent-Workman also argues that the district court should not have narrowed her discrete retaliation claim to just one act of retaliation—her non-selection for the vacant program coordinator position. But whatever other discrete acts of retaliation Laurent-Workman argues that her amended complaint alleges, they were not well-pled. *See Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (instructing that only well-pleaded facts are assumed). The district court's reading of the amended complaint is also justified by Laurent-Workman's trial counsel's representation that "[t]here's two aspects of the retaliation claim . . . a hostile working environment retaliation claim, and . . . a retaliation claim *for the nonselection*." J.A. 61 (emphasis added).

oppose a practice that Title VII forbids, Fourth Circuit precedent imported the substantive discrimination standard into retaliation claims. *See Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001). Thus, we have held that the challenged acts of retaliation must "result[] in an adverse effect on the 'terms, conditions, or benefits' of employment." *Id.* at 865.

The Supreme Court charted a new course in *Burlington Northern*. That case decided what standard the anti-retaliation provision imposed on a railroad company maintenance worker suing her supervisors for acts of retaliation. *Burlington N.*, 548 U.S. at 57. The Supreme Court held that the phrase "discriminate against" in the anti-retaliation provision does not confine actionable retaliation to adverse actions that alter the terms and conditions of employment. *Id.* Comparing the linguistic differences between the anti-retaliation provision and the substantive discrimination provision, the Court concluded that the terms of the anti-retaliation provision include a wider variety of conduct within its scope. *Id.* at 62–63. Beyond the text, the Court described a practical concern driving its understanding of the anti-retaliation provision's purpose. Observing that an "employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace," the Court recognized that the anti-retaliation provision's goal of "prevent[ing] harm to individuals based on what they do" would not be secured "by focusing only upon employer actions and harm that concern employment and the workplace." *Id.* at 63.

*Burlington Northern* thus rejected the standards that treated the anti-retaliation provision "as forbidding the same conduct prohibited by the [substantive] provision," such as the one we articulated in *Von Gunten*. *Id.* at 67. Instead, "a plaintiff must show that a

15

reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The standard sets out general terms to accommodate the "constellation of surrounding circumstances, expectations, and relationships" that color an employee's experience, but it also features two guardrails. *Id.* at 69. By requiring an employee claiming retaliation to show that her employer's actions are "materially adverse," the standard separates minor harms from those that threaten to chill employees from opposing unlawful discrimination. *Id.* at 68. We must also assess a retaliation claim against the perspective of a reasonable employee to avoid "the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69.

Since *Burlington Northern*, we have not fully studied the question of its total effect on Title VII retaliation claims. After the decision, we held that it applied to a retaliation suit premised on discrete acts of retaliation against a private-sector employer. *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341–42 (4th Cir. 2008). But Laurent-Workman is suing the United States Army, a federal agency, on both discrete-act and retaliatory hostile work environment theories. Our task is to decide whether *Burlington Northern* also contemplated federal-sector employers and retaliatory hostile work environment claims.[2]

---

[2] The parties do not dispute that Laurent-Workman's retaliation claim for non-selection alleged an adverse employment action. Therefore, that discrete-act retaliation claim presumably would satisfy either standard.

16

1.

We start by considering whether the adversity standard in *Burlington Northern* applies to retaliation claims against federal employers. Although we have never addressed this question in a published opinion, the issue is a familiar one. In *Caldwell v. Johnson*, a scientist claimed that she faced retaliation for opposing gender-based discrimination while working for the Environmental Protection Agency. 289 F. App'x 579, 583 (4th Cir. 2008) (unpublished). She argued that the *Burlington Northern* standard applied to her as a federal employee claiming retaliation. *Id.* at 587. In response, the agency made a similar argument to the one the Army makes here; it argued that *Burlington Northern* adopted the "materially adverse" standard after carefully comparing the difference in § 2000e–2(a)(1) and § 2000e–3(a), both of which apply to private employees, not federal ones. *Id.* To settle the dispute, we focused on two overarching considerations.

First, we observed that the federal-sector provision regulates "*[a]ll* personnel actions." *Id.* at 589 (citing § 2000e–16(a)) (emphasis and alteration in original). This means the federal-sector provision outlaws a broader range of employer conduct than the substantive discrimination provision, which covers activity related to "compensation, terms, conditions, or privileges of employment." § 2000e–2(a)(1). At the same time, we recognized the anti-retaliation provision broadly covers "discrimination" against those who oppose Title VII violations and, unlike the federal-sector provision, does not limit itself to "personnel actions." *Caldwell*, 289 F. App'x at 589. While Congress did not define "personnel actions" in Title VII, we determined that "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating" constitute only "the general level of decision we

17

think contemplated by the term personnel actions" but the term may also include a broader range of activity. *Id.* (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)); *Von Gunten*, 243 F.3d at 866 n.3 (internal quotations omitted). Satisfied that "[t]his definition comports with the ordinary meaning of the phrase," we opined that "many decisions involving human resources constitute personnel actions despite falling short of being ultimate employment decisions." *Caldwell*, 289 F. App'x at 589 (internal quotations omitted).

Second, we noted that we previously have applied the pre-*Burlington Northern* private-sector standard to a federal employee's retaliation claim. *Id.* at 590 (citing *Baqir v. Principi*, 434 F.3d 733, 747–48 (4th Cir. 2006); *Price v. Thompson*, 380 F.3d 209, 212–13 (4th Cir. 2004)). That traditional application is particularly important because "it would be illogical for Congress to impose an additional element of proof on federal employees when it has provided identical remedies for federal and private employees who allege retaliation." *Id.* at 591. Nothing in *Burlington Northern*'s reasoning undermines that custom. Also "worthy of mention" is that *Burlington Northern* adopted the "materially adverse" standard after citing a District of Columbia Circuit decision, which applied the "materially adverse" standard to an employee of the FBI, a federal agency. *Id.* (citing *Rochon*, 438 F.3d at 1219). Thus, we held in *Caldwell* that *Burlington Northern* "applies to federal employees and private employees alike." *Id.* at 588.

The Army urges us to brush *Caldwell* aside, arguing that "[l]ike the private-sector substantive discrimination provision, the federal-sector provision of Title VII uses markedly narrower text than the private-sector anti-retaliation provision at issue in *Burlington Northern*." Resp. Br. at 20. This is so, the Army argues, because the federal-sector provision

18

is expressly limited to "personnel actions." § 2000e–16(a). By casting the federal-sector provision in the same lot with the substantive discrimination provision as deliberately narrow, the Army seeks to distance the federal-sector provision from the broad language of the anti-retaliation provision. We read the interplay between these provisions differently.

We are unpersuaded by the Army's view that the inclusion of "all personnel actions" in the federal-sector provision grants it a narrower scope than the anti-retaliation provision which omits that language. Instead, as *Caldwell* recognized, the reference to "personnel actions" in the federal-sector provision broadens, rather than limits, the provision beyond the terms of the substantive discrimination provision. 289 F. App'x at 589. Importing a narrow reading of the federal-sector provision into a federal retaliation claim ignores the salient remark in *Burlington Northern* that an "employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." 548 U.S. at 63 (emphasis omitted).

The Army's view of the federal-sector provision's scope also conflicts with Title VII's statutory scheme. Section 2000e–16(d) specifies that the "provisions of section 2000e–5(f) through (k) . . . shall govern" federal-sector claims. Situated among that range of governing law lies § 2000e–5(g)(2)(A), a section of the statute that authorizes relief for a violation of the anti-retaliation provision. *See Gomez-Perez v. Potter*, 553 U.S. 474, 488 n.4 (2008). In other words, the federal-sector provision incorporates by reference the anti-retaliation provision. Naturally, the federal-sector provision adopts the standards applicable to the anti-retaliation provision as well. *See Baqir*, 434 F.3d at 742 (applying pre-*Burlington Northern* private-sector anti-retaliation standard to federal employees); *see also Rochon*,

19

438 F.3d at 1219 ("Nothing in § 2000e–16(d) or § 2000e–5(g) suggests § 2000e–3(a) is to be read differently when applied to the Government").

In any event, the Army's comparison between the substantive discrimination provision and the federal-sector provision misidentifies their common trait. What the two provisions share is not the breadth of employer conduct each regulates, but what they protect. By outlawing discrimination against individuals based on a set of protected characteristics, each serves to "prevent injury to individuals based on who they are, *i.e.,* their status." *See id.* at 63 (describing the substantive discrimination provision).

Our examination of Title VII's text, *Burlington Northern*, and *Caldwell* compels us to hold that the *Burlington Northern* "materially adverse" standard applies to private employees and federal employees alike. That conclusion is in line with the majority view of the other circuits to address the question. *See, e.g.*, *Tonkyro v. Sec'y, Dep't of Veterans Affairs*, 995 F.3d 828, 836–37 (11th Cir. 2021); *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013); *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 954–55 (8th Cir. 2011); *Lapka v. Chertoff*, 517 F.3d 974, 985–86 (7th Cir. 2008); *Patterson v. Johnson*, 505 F.3d 1296, 1299 (D.C. Cir. 2007).

2.

We now consider whether the *Burlington Northern* holding applies to retaliatory hostile work environment claims. A hostile work environment claim is available to Title VII plaintiffs who have not experienced a tangible employment action, *i.e.*, suffered economic consequences. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Plaintiffs may claim mistreatment based on their protected characteristics in violation of the

20

substantive discrimination provision under a hostile work environment theory, but only if that mistreatment is so "severe or pervasive" that it affects the "terms, conditions, or privileges" of her employment. *Id.*; *Harris*, 510 U.S. at 21–22. The defining characteristic of the *Meritor/Harris* standard is its incorporation of the substantive discrimination provision's prohibition of discrimination "against any individual with respect to his *compensation, terms, conditions, or privileges of employment.*" § 2000e–2(a) (emphasis added). It measures the harshness of a workplace to determine whether those conditions are tantamount to an adverse employment outcome prohibited by the statute. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the '*conditions' of the victim's employment.*" (emphasis added)); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) ("Because the workplace environment is one of the 'terms, conditions, or privileges of employment,' Title VII creates a cause of action for employees forced to work in a hostile workplace.") (internal citation omitted).

Before *Burlington Northern*, we held that "[r]etaliatory harassment can constitute adverse employment action" if it affected the terms, conditions, or benefits of employment. *Von Gunten*, 243 F.3d at 866–69. But the Supreme Court now imposes a less demanding heuristic for retaliation claims to accomplish the purpose of that provision. Plaintiffs need to show material adversity precisely because acts of retaliation that do not alter the terms of employment still can frustrate Title VII's aims. *Burlington Northern*, 548 U.S. at 63. Unlike the substantive discrimination provision, the anti-retaliation provision seeks to deter not status-based discrimination, but employer retribution that chills employee opposition

21

to discrimination. *Id.* So it follows that any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" satisfies the "materially adverse" standard under the anti-retaliation provision. *Id.* at 68.

Inserting the *Meritor/Harris* standard from the substantive discrimination provision back into the anti-retaliation provision repeats the error *Burlington Northern* sought to correct. The Supreme Court emphasized that the disparate goals of the substantive discrimination and anti-retaliation provisions motivated its adoption of a broader standard for retaliation claims. *Id.* at 63 ("The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct."). That reasoning is fortified by the long-held understanding that Congress created federal anti-retaliation laws to "[m]aintain[] unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997); *see also Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) ("Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances."); *Darveau*, 515 F.3d at 343 (reciting the purpose of anti-retaliation provisions under Title VII and Fair Labor Standards Act as "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees"). It does not give way simply because retaliation takes the form of a hostile work environment.

To be sure, *Burlington Northern* did not jettison the *Meritor/Harris* formula completely. While retaliation claims are not limited to actions that alter the terms and conditions of employment, "severity" and "pervasiveness" are useful units of measurement

22

to determine whether claimed harassment is actionable. After all, the standards for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. Cty. of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted). "Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace,'" *id.*, "that all employees experience," *Burlington N.*, 548 U.S. at 68. The severity and frequency of hostility are important factors to consider when determining whether the circumstances would dissuade a reasonable employee from opposing discrimination, just as they are for assessing substantive hostile work environments. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (listing factors considered in hostile work environment analysis); *cf. Burlington N.*, 548 U.S. at 77 (Alito, J., concurring in judgment) (acknowledging that under the materially adverse standard "employer conduct that causes harm to an employee is permitted so long as the employer conduct is not *so severe* as to dissuade a reasonable employee from making or supporting a charge of discrimination" (emphasis added)).

Accordingly, a retaliatory hostile work environment must be so severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination. This standard retains the "middle path" set out in *Harris* between accepting "any conduct that is merely offensive" and requiring plaintiffs to show a "tangible" injury, 510 U.S. at 21–22. But it also harmonizes that compromise with the goal of the anti-retaliation provision "to provide broad protection from retaliation." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015) (quoting *Burlington N.*, 786 F.3d at 67) (internal quotation omitted).

23

B.

The district court understandably applied the *Meritor/Harris* standard to determine the level of adversity Laurent-Workman's retaliatory hostile work environment claim must show. However, given the Supreme Court and our precedents, a hostile work environment claim based on retaliation must instead allege that the retaliatory conduct (1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) can be attributed to the employer. *Burlington N.*, 548 U.S. at 68.; *Okoli*, 648 F.3d at 220.

Under that standard, Laurent-Workman has stated a prima facie case. An "employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience," *Burlington N.*, 548 U.S. at 68, but the consistent (even if not constant) conduct Laurent-Workman alleges plausibly qualifies as materially adverse. She claims that after she complained to Khalifeh and Thomas about Adams's and Khalifeh's conduct, Khalifeh engaged in a series of unpredictable management decisions and acts of sabotage. These alleged reprisals ranged from erroneous reprimands to bogus denials of professional training opportunities to the alteration of work product in a manner damaging to Laurent-Workman's reputation, on top of additional meddling.

Although any one of these allegations does not amount to much when considered in isolation, "[t]hese determinations depend on the totality of the circumstances, as [a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the

24

overall scenario." *DeMasters*, 796 F.3d at 417 (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir. 2006)). Together, the allegations tell a multi-act story of undermining, gaslighting, and disruption. She has adequately pled that a reasonable employee may have been dissuaded from following through with her complaints due to Khalifeh's conduct. *See Tobey*, 706 F.3d at 386 ("Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## C.

Finally, Laurent-Workman quarrels with the district court's conclusion that the facts she alleged did not justify an inference that her non-selection for the program coordinator position was caused by her prior complaints of ill-treatment. When it dismissed her retaliation claim, the district court concluded that Laurent-Workman failed to plausibly allege causation based on the temporal proximity between her last known Title VII complaint on December 2, 2019, and her non-selection for the program coordinator position sometime following her interview on February 7, 2020—"even assuming that Castro somehow had knowledge of all of Plaintiff's protected activity." J.A. 92.

We agree that Laurent-Workman failed to allege a non-speculative link between her Title VII claim and her non-selection. Causation can be shown in two ways: by "show[ing] that the adverse act bears sufficient temporal proximity to the protected activity," or by showing "the existence of facts that suggest that the adverse action occurred because of the protected activity," or a combination of the two. *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (cleaned up). Laurent-Workman's allegations support neither showing.

25

"[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action" may establish causation only if it is "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Yet there was at least a two-month temporal gap between Laurent-Workman's last known Title VII complaint and her non-selection for the program coordinator position. Although there is no "bright-line rule" for when temporal proximity helps or hurts a cause of action for retaliation, *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 126–27 (4th Cir. 2021), a two-month temporal gap "between [] notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events," *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (dealing with a schoolteacher who was terminated at the end of the academic year, just over two months after his supervisor learned of his protected activity).

Laurent-Workman may overcome the delay by showing that her non-selection came at a "natural decision point . . . making likely" that any adverse action would happen at that time. *Id.* But the amended complaint alleges that Castro assumed a supervisory role as early as July 2019, about seven months before Laurent-Workman's February 2020 non-selection, and that she knew about her Title VII complaints during that time. Unlike the plaintiff in *King*, who was a teacher fired at the end of the academic year, Laurent-Workman's amended complaint does not lend itself to an inference that Castro did not have an opportunity to retaliate against her during the prior seven-month period as her supervisor.

Other gaps in Laurent-Workman's amended complaint underscore its deficient showing of causation. For example, it does not allege whether Laurent-Workman was qualified for the

26

program coordinator position. *See Glenn v. Wells Fargo Bank, N.A.*, 710 F. App'x 574, 577 (4th Cir. 2017) (unpublished) (affirming dismissal of retaliation because the appellant lacked factual allegations that he qualified for the benefits he sought). Nor does it allege whether the position was filled by a non-qualified applicant or anyone at all. Thus, we find no error in the district court's assessment of Laurent-Workman's discrete-act retaliation claim.

V.

For the foregoing reasons, we affirm the dismissal of Laurent-Workman's discrete-act retaliation claim but we vacate the dismissal of her retaliatory and race-based harassment claims and remand those claims to the district court for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART*